*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0410p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
     *Plaintiff-Appellee,*

   *v.*

JORGE A. MARTINEZ,
     *Defendant-Appellant.*

Nos. 06-3882/4206

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 04-00430—Donald C. Nugent, District Judge.

Argued: June 16, 2009

Decided and Filed: December 1, 2009

Before: KEITH, COLE, and WHITE, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Jonathan P. Witmer-Rich, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant. Nina Goodman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Jonathan P. Witmer-Rich, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant. Nina Goodman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

———————————

**OPINION**

———————————

  COLE, Circuit Judge. A jury convicted Defendant-Appellant Dr. Jorge A. Martinez of eight counts of distribution of controlled substances, in violation of 21 U.S.C. § 841 (Counts 2-5, 7-8, and 10-11); fifteen counts of mail fraud, in violation of 18 U.S.C. § 1341 (Counts 13-27); ten counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts 28-37); twenty-one counts of health care fraud, in violation of 18 U.S.C. § 1347 (Counts 38-58); and

1

two counts of health care fraud resulting in the death of patients, in violation of 18 U.S.C. § 1347 (Counts 59-60). Martinez's appeal is based on his claims that the evidence was insufficient to support his conviction and that the district court's admission of a video portraying a non-witness physician performing medical procedures constituted reversible error. Martinez also argues that his sentence is both procedurally and substantively unreasonable. We **AFFIRM**.

## I.  BACKGROUND

### A.  Factual Background

Dr. Jorge A. Martinez, an anesthesiologist, operated a pain-management clinic in Parma, Ohio. As part of his practice, Martinez regularly prescribed controlled substances and administered injections to ease his patients' pain and charged the cost of the prescriptions and injections—billed as "nerve blocks"—to the patients' private insurance carriers, Medicaid, Medicare, or the Ohio Bureau of Workers' Compensation ("BWC") (collectively "health care benefit programs"). The bills used standard billing codes to identify the services for which Martinez requested compensation. Martinez generally advised his patients to receive nerve-block injections every one to two weeks, and he wrote his patients prescriptions for oral pain medication to use during the periods between injections.

The Federal Bureau of Investigation ("FBI") began investigating Martinez for health care fraud in the summer of 2002. At that time, as part of an unrelated investigation, the FBI noticed that Martinez ranked the highest among Ohio medical practitioners in submitting claims for reimbursement for certain procedures to Blue Cross/Blue Shield and that he ranked well above his Ohio peers for billing codes for certain medical procedures. During this period, the FBI also became aware that the Office of the Inspector General of the United States Department of Health and Human Services had received a complaint from its Medicaid unit regarding Martinez's billing practices. FBI Agent Jennifer A. Boyer thereupon began an investigation. As part of its investigation, the FBI enlisted one of Martinez's employees, Cindy Bayura, a nurse, to carry an audio-recorder for two days and a video camera for eight days to capture covertly the interactions between Martinez and his

patients. Based on the evidence gathered, the Government obtained a search warrant for Martinez's files, arrested him, and indicted him.

The Government's theory at trial was that from about January 1998 until September 2004, Martinez engaged in fraud and endangered his patients by omitting physical examinations, ignoring "red flags" of painkiller addiction, giving appreciably more injections than were medically necessary or advisable, and providing at-risk patients with treatments that would leave them dependent on him for pain-suppressant prescriptions. According to the Government, Martinez hinged patients' receipt of oral pain medication prescriptions on their willingness to visit his office and receive nerve-block injections, which Medicare, Medicaid, and other insurance companies reimbursed at higher rates than other injections and office visits. The Government also argued that Martinez's fraud involved ignoring his patients' medical needs, resulting in the death of two patients.

To support its theory at trial, the Government presented evidence that Martinez's administration of injections to patients far exceeded the number administered by other pain-treatment doctors in Ohio. For example, the Government admitted BWC reports showing that Martinez gave each patient an average of sixty-four nerve-block injections per year, while the state average for pain-treatment patients was only 2.5 injections per year. Also, on the days that patients received injections, Martinez gave his patients an average of 4.14 shots in one visit, while the statewide average was only 1.18. Additionally, the Government presented evidence that Martinez did not inform patients of the "optional" nature of the injections or of the potential risks and side effects.

The Government's evidence also established that Martinez saw many more patients per day than other Ohio doctors, which, according to the Government's theory, meant that Martinez provided substandard medical care. According to sign-in sheets maintained at Martinez's offices and testimony from former employees, Martinez often saw well over 100 patients per day and, on average, around sixty patients during the eight-and-one-half hours his office was open. At trial, members of Martinez's staff testified that he frequently spent only two to five minutes with patients during appointments and performed little or no physical examination of patients during these brief visits, but Martinez billed the visits under billing codes used for more extensive office visits. Relatedly, the jury heard evidence

that a doctor who was properly treating his patients for pain could not possibly see that number of patients each day.

The Government's expert witness, Dr. Douglas Kennedy, a pain-management specialist, reviewed the videos of office visits and the medical records for the patients named in the indictment. He testified that Martinez's billing to health care benefit programs was "not appropriate in any fashion," (Joint Appendix ("JA") 1359), because the procedures and office visits for which Martinez submitted bills "could not have been performed." (JA 1359.) Moreover, even if the procedures were performed, "they were not medically necessary in any way." (JA 1359.) Dr. Kennedy further explained that the appropriate medical practice for administering nerve-block injections allows for no more than "three injections over three to six months" unless additional injections are "absolutely indicated and everything else has been ruled out," (JA 1303, 1305), but that Martinez routinely provided as many as twenty injections to patients at their weekly or biweekly appointments. Additionally, Dr. Kennedy concluded that Martinez's prescriptions for controlled substances could not have been for legitimate medical purposes and that such prescriptions were outside the bounds of accepted medical practice. Because of all these factors, Dr. Kennedy testified that Martinez and his patients did not have a true doctor–patient relationship.

The jury also heard evidence that Martinez did not comply with accepted standards of medical practice, including the Ohio State Medical Board's guidelines for prescribing controlled substances for intractable pain. Martinez's patients likewise testified that he prescribed high dosages of pain medications without any physical examination or discussion of their symptoms. And another government expert witness, Dr. Theodore Parran, a specialist in pain management and in the treatment of addiction, reviewed the files for those patients named in the indictment and testified that Martinez prescribed medication for patients he saw for only a few minutes and frequently ignored "red flags" indicating that a patient's drug use "was out of control." (JA 2084-91, 2134-66.)

The Government also argued that Martinez's techniques were outside the bounds of accepted medical practice. The jury was repeatedly shown videos of Martinez treating his patients by walking into an exam room, with needle in hand, quickly "jabbing" the patient and sometimes "twisting" the needle, then quickly leaving the room. Dr. Kennedy testified

that this technique, without any physical examination or the "palpatation of topical landmarks," made it impossible for Martinez to "know where the medicine [was] going," and Martinez could not have reached the nerves using such an unorthodox technique. (JA 1313-14.)  Dr. Kennedy also relied on a video of Dr. Mark Boswell administering nerve-block injections to demonstrate the "proper" way to perform the medical procedures for which Martinez billed.

Finally, the Government presented evidence regarding several patients who it alleged had died as a result of Martinez's care, including detailed evidence about the circumstances surrounding the deaths of two patients, John Lancaster and Blair Knight.  The Government presented evidence that Martinez's course of treatment for these two patients led to their deaths.

In his defense, Martinez called several former employees and fifteen former patients, all of whom testified that Martinez provided thorough and effective pain treatment.  Martinez also called Dr. Thomas Stinson, an anesthesiologist, as an expert witness, who testified that the nerve-block injections performed by Martinez were within the bounds of accepted medical practice.

**B.  Procedural Background**

Martinez was charged in a sixty-count indictment.  The district court dismissed Count 1 (conspiracy to distribute drugs) after all of the evidence had been submitted. Following a week-long deliberation, on January 12, 2006, the jury acquitted Martinez on Counts 6, 9, and 12—three of the twelve counts of distribution of controlled substances outside the bounds of medical practice—and convicted him on all other counts.  Martinez filed motions for a judgment of acquittal, under Rule 29 of the Federal Rules of Criminal Procedure, and for a new trial, under Rule 33 of the Federal Rules of Criminal Procedure. The district court denied both motions.  On June 14, 2006, the district court sentenced Martinez to concurrent terms of 240 months in prison each on Counts 2-5, 7-8, 10-11 and 13-37, 120 months in prison each on Counts 38-58, and life imprisonment on Counts 59-60.

Concluding that the calculation of restitution was complicated and required further factfinding, the district court referred the matter to a magistrate judge.  On August 23, 2006, the district court adopted the magistrate judge's Report and Recommendation as to the

amount of restitution to be paid by Martinez and entered its final judgment. Counsel for Martinez filed a notice of appeal on August 30, 2006. The district court entered amended judgments that altered the restitution calculation on October 12 and 13, 2006, setting the final amount of restitution at $14,322,003.12. Martinez timely appealed.

## II.  ANALYSIS

Martinez makes four arguments on appeal. First, he argues that the district court erred in admitting the video of Dr. Mark Boswell performing certain medical procedures on the grounds that the video was inadmissible hearsay and that its admission violated Martinez's rights under the Confrontation Clause. Second, Martinez contends that the evidence presented at trial was insufficient to sustain his convictions. Third, Martinez claims that Dr. Parran's expert testimony was inadmissible because it was mere speculation. Finally, Martinez argues that his sentence is substantively and procedurally unreasonable. We address each argument in turn.

## A.  Admissibility of the Boswell Video

### 1.  Inadmissible hearsay

Martinez appeals his conviction on the ground that the district court erred in admitting the video of Dr. Mark Boswell that Dr. Kennedy used during his testimony to demonstrate the proper way to perform nerve-block injections. We review the district court's admission or exclusion of evidence under an abuse-of-discretion standard. *See United States v. Hunt*, 521 F.3d 636, 642 (6th Cir. 2008) (citing *United States v. Ganier*, 468 F.3d 920, 925 (6th Cir. 2006)). However, "[i]n reviewing a [district] court's evidentiary determinations, this [C]ourt reviews de novo the court's conclusions of law . . . and reviews for clear error the court's factual determinations that underpin its legal conclusions." *United States v. McDaniel*, 398 F.3d 540, 544 (6th Cir. 2005) (quoting *United States v. Reed*, 167 F.3d 984, 987 (6th Cir. 1999)). To the extent the district court's admission of the Boswell video constitutes an error of law, such error is an abuse of discretion. *Id.* ("[I]t is an abuse of discretion to make errors of law or clear errors of factual determination.").

Turning to the video at issue, during her initial investigation of Martinez, Agent Boyer contacted Dr. Boswell, the Chief of the Pain Clinic at University Hospital of

Cleveland ("University Clinic"). She asked him whether the University Clinic's library contained any videos depicting the type of injections for which Martinez had billed third parties. Because the library did not contain any such video, Dr. Boswell agreed to record himself performing three types of nerve-block injection procedures on patients: a diagnostic branch block (or facet injection), a transforaminal epidural steroid injection, and a hypogastric plexus block. The video that Dr. Boswell recorded includes an audio track of him communicating with patients and other University Clinic staff members, and the portion of the video depicting a transforaminal epidural steroid injection includes textual phrases superimposed on the screen. Some of the phrases are descriptive, like "Preparing a sterile operative field"; while others are instructive, like "Continue proper needle placement in AP view by injecting contrast agent." Although Dr. Boswell did not appear as a witness during the trial, the video of him performing the three procedures was admitted during Dr. Kennedy's testimony. The video was played in three segments, so that each procedure was played in its entirety. After each segment, Dr. Kennedy explained the procedure, including his views on how the procedure should be performed. After the second segment of the video was played, Martinez's counsel objected to the admission of the video on hearsay grounds. The following colloquy occurred:

> Court: How is this admissible.
>
> [Government]: Because in aid of [Dr. Kennedy's] testimony, he has reviewed these videos. He is familiar with this practitioner and has done tens of thousands of these procedures and would like to rely on this just as a textbook or any other material relied on by experts in the field to illustrate what these procedures are.
>
> Court: That's an argument.
>
> [Defense Counsel]: And that's why I would like to be heard. There is no foundation - - we don't know if he is an expert, Judge.
>
> Court: [Dr. Kennedy] testified that he was. Do you know this Doctor who performed this?
>
> [Dr. Kennedy]: Yes, sir.
>
> Court: Is he an expert in the field?
>
> [Dr. Kennedy]: Yes.
>
> Court: And you recognize him as such?

[Dr. Kennedy]: Yes.

Court: And other people recognize him as such?

[Dr. Kennedy]: Yes.

[Defense Counsel]: But how do we get around hearsay, your Honor?

Court: Objection is overruled.

(JA 1244-45.) After the Government played and Dr. Kennedy explained the second segment of the video, Martinez's counsel once again objected to the admission of the evidence. The court again overruled the hearsay objection, and the Government played the third segment of the video. Following Dr. Kennedy's detailed medical explanation of the three procedures demonstrated by Dr. Boswell, the Government showed videos of Martinez performing nerve-block procedures. At one point, Dr. Kennedy explicitly compared Martinez's performance to Dr. Boswell's performance: "Next, [Dr. Martinez] billed for [injections] like you saw Dr. Boswell perform yesterday. [Dr. Martinez] performed two facet injections like you saw [Dr. Boswell] perform . . . . [Dr. Martinez] did that in a span of about 20 seconds, billed $1,935, and you saw how long he was in the room without examining the patient, with nonsterile technique . . . . Need I say more?" (JA 1322.)

On appeal, Martinez challenges both the verbal portions of the video and Dr. Boswell's nonverbal conduct on the video as impermissible hearsay. In conducting our review, we must first determine whether the video constitutes a hearsay "statement" under the Federal Rules of Evidence. The Federal Rules of Evidence define "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). The verbal portions of the video—both oral and written—easily satisfy the definition, but the definition of statement also includes "nonverbal conduct of a person, if it is intended by the person as an assertion." Fed. R. Evid. 801(a); *see also United States v. Sutton*, 642 F.2d 1001, 1051 (6th Cir. 1980) (excluding defendants' "nonverbal conduct showing possession and distribution of a large volume of stolen merchandise" as impermissible hearsay). "The key to the definition is that nothing is an assertion unless intended to be one." Fed. R. Evid. 801(a) advisory committee's note. Here, Dr. Boswell made the video in response to an FBI request, with the purpose of demonstrating the proper performance of nerve-block injections.

Accordingly, because of Dr. Boswell's intent, we conclude that his conduct during the course of the video is an assertion of proper medical performance and is, therefore, a statement under Rule 801(a) of the Federal Rules of Evidence.

Because the video contains "statements," we must next determine whether the statements were offered for the "truth of the matter asserted." Fed. R. Evid. 801(c). The Government argues that the Boswell video was introduced for a non-hearsay purpose—to assist the jury in understanding Dr. Kennedy's testimony. Demonstrative evidence is admissible to assist jurors in understanding basic principles. *See, e.g.*, *In re Air Crash Disaster*, 86 F.3d 498, 539 (6th Cir. 1996) (affirming admittance of video "to demonstrate [a] circuit breaker's inner workings," in part, because "[u]se of the videotape was limited to demonstration, and the court instructed the jury about the limited basis of its admission"). In this case, however, the Government used the video for an additional purpose. The Government's opening statement and closing argument show that the Government intended the video to demonstrate not only basic principles but the medically proper way to perform nerve-block procedures—and to show that Martinez performed the injections improperly. In its opening statement, the Government argued: "Jorge Martinez's version of an epidural will be shown to you, and also shown to you will be the University Hospital's Pain Management Clinic version of what an epidural really is, and you will see quite a difference." (JA 524.) Similarly, in closing argument, the Government referred to the Boswell video, and stated that it "showed you how these shots are supposed to be given." (JA 526.) Dr. Kennedy used the video for the same purpose during his testimony. (*See, e.g.*, JA 1260 (telling the jury that "[y]ou saw a lumbar trancoraminal procedure with Dr. Boswell").) Thus, the video was offered "for the truth of the matter asserted"—that the procedures as performed in the video are properly performed, and that if Dr. Martinez's performance of those same procedures differed, it was improper. Accordingly, we conclude that the video is hearsay.

Of course, the video may still be admissible if it fits under one of the hearsay exceptions. *See, e.g.*, Fed. R. Evid. 803, 804, 807. The most relevant exception, the "learned treatise" exception, provides:

> To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct

examination, statements contained in *published* treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, *established as a reliable authority* by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

Fed. R. Evid. 803(18) (emphasis added). At the outset, we note that we have not before considered whether a video constitutes a "learned treatise." In *Constantino v. Herzog*, however, the Second Circuit reviewed the district court's admission of a fifteen-minute training video from the audiovisual library of the American College of Obstetricians and Gynecologists. 203 F.3d 164, 168 (2d Cir. 2000). Both parties recognized that the video was hearsay, but the district court found the video admissible under the "learned treatise" exception. *Id.* at 168-69. The Second Circuit affirmed, holding that the video was a "contemporary variant of a published treatise," and "the video's use as a training resource—'written primarily and impartially for professionals, subject to scrutiny and exposure for accuracy, with the reputation [of its producers and sponsors] at stake'—is clearly an important index of its authoritativeness." *Id.* at 171, 173 (quoting Fed. R. Evid. 803(18) advisory committee's note) (alteration in original). The court also acknowledged that the video included recommendations culled from available literature and the video's narrator had "credentials which compared favorably with those of any expert who testified at trial." *Id.* at 173.

The Boswell video does not have the same indicia of reliability as the training video at issue in *Constantino*. "[L]earned treatises usually have 'sufficient assurances of trustworthiness . . . . [A]uthors of treatises have no bias in any particular case . . . [and] are acutely aware that their material will be read and evaluated by others in their field, and accordingly feel a strong pressure to be accurate.'" *In re Welding Fume Prods. Liab. Litig.*, 534 F. Supp. 2d 761, 765 (N.D. Ohio 2008) (quoting 2 McCormick on Evidence § 321 (6th ed. 2006)). In this case, the Boswell video was prepared for and given to the FBI for litigation purposes, it was not subjected to peer review or public scrutiny, and it was not "'written primarily for professionals . . . with the reputation of the writer at stake.'" *Schneider v. Revici*, 817 F.2d 987, 991 (2d Cir. 1987) (quoting the advisory committee's note accompanying Rule 803(18) to reject the application of the "learned treatise" exception to video evidence). Because the Boswell video does not have the necessary qualities of

reliability, we do not need to decide whether a video *could* satisfy the "learned treatise" exception—we simply conclude that the video in this case was impermissible hearsay.

Having determined that the video was erroneously admitted, next, we ask whether its admission was harmless error or whether it requires reversal of Martinez's conviction. In making this determination, we "must take account of what the error meant to [the jury], not singled out and standing alone, but in relation to all else that happened . . . . In other words, we must find that it was more probable than not that the error materially affected the verdict." *United States v. Baker*, 458 F.3d 513, 520 (6th Cir. 2006) (quoting *United States v. Pugh*, 405 F.3d 390, 400-01 (6th Cir. 2005)). In determining whether such error has occurred, we look to "the proceedings in their entirety, in the light of the proofs at trial." *Beck v. Haik*, 377 F.3d 624, 635 (6th Cir. 2004), *overruled on other grounds by Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009) (internal citations and quotation marks omitted).

In this case, the video was used to bolster the testimony of the Government's primary expert and created a direct visual contrast between "proper" injections and the allegedly "improper" injections Martinez performed. Although the video was admitted in error, we conclude that the error did not materially affect the verdict given the remainder of the evidence, including Dr. Kennedy's opinions based on his own review of the Bayura recordings and patient files. The jury heard evidence that the procedures for which Martinez was billing required careful, precise placement of injection needles, and that such procedures could not have been performed during the duration of his patients' brief office visits. The jury viewed multiple videos of Martinez quickly entering a room and injecting a patient or repeatedly and rapidly injecting a patient. The jury also heard testimony that such procedures did not constitute the billed-for procedures submitted to health care benefit programs. Moreover, Dr. Kennedy and Dr. Parran both testified that, if performed, the billed-for procedures were medically unnecessary and that Martinez's prescribing practices were outside the bounds of accepted medical practice. To counter this evidence, Martinez presented the testimony of a single doctor, and that doctor did not say that Martinez was performing the proper procedures during the videos. Thus, given the overwhelming evidence that Martinez was not performing medically necessary procedures and that the procedures were not those for which he was billing—and considering the weak evidence to the contrary—we conclude that any error in admitting the Boswell video was harmless.

*2. Confrontation Clause*

On appeal, Martinez also challenges the admission of the Boswell video under the Confrontation Clause of the Sixth Amendment.  The Confrontation Clause states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  According to the Supreme Court in *Crawford v. Washington*, "the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.  It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination."  541 U.S. 36, 61 (2004); *see also Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527, 2536 (2009).

Because of the importance of cross-examination, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine."  *Crawford*, 541 U.S. at 59.  This restriction applies to only statements that are "offered to prove the truth of the matter asserted," *United States v. Gibbs*, 506 F.3d 479, 486 (6th Cir. 2007), and it applies whether or not the statement would otherwise be admissible under a hearsay exception.  *See United States v. Hadley*, 431 F.3d 484, 493-95 (6th Cir. 2005).  Generally, asserted violations of the Confrontation Clause are reviewed using the harmless-error analysis.  *Pugh*, 405 F.3d at 400.  In this case, however, Martinez did not object to the Boswell video on Confrontation Clause grounds at trial, so we review his claim for plain error.  *Hadley*, 431 F.3d at 498.  To establish plain error, a defendant must show (1) that there was an error—"some sort of deviation from a legal rule"; (2) that the error was "obvious, rather than subject to reasonable dispute"; and (3) that the error affected the defendant's "substantial rights."  *Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009) (internal quotation marks omitted).  "[I]f the above three prongs are satisfied," we then have the "*discretion* to remedy the error—which ought to be exercised only if the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."  *Id.* (alteration in original) (internal quotation marks omitted).  However, because we have already determined that any error in the admission of the video was harmless and we would not exercise our discretion to remedy any error here, Martinez cannot establish plain error.  *See United States v. Kingsley*, 241 F.3d 828, 835-36 (6th Cir. 2001); *United States v. Thomas*, 11 F.3d 620, 630 (6th Cir. 1993).

**B.  Sufficiency of the Evidence**

Martinez also argues that the evidence is insufficient to support his convictions.  In particular, he contends that the evidence was insufficient to support his conviction for the distribution of controlled substances outside the bounds of medical practice and for health care, wire, and mail fraud because each patient listed in the indictment for those charges did not testify, there was no audio or video evidence of those patients, there was no description of Martinez's treatment of those patients by government witnesses, and the names of those patients were not mentioned during the testimony of the expert witnesses.  He also argues that the evidence was insufficient on the fraud counts based on nerve-block injections because the Government's case at trial focused solely on Martinez's prescription practices, not the nerve-block injections.

In determining whether there is sufficient evidence to support a conviction, the question before us is whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted).  In making this determination, we "reverse a judgment for insufficiency of evidence only if [the] judgment is not supported by substantial and competent evidence upon the record as a whole, [whether or not] the evidence is direct or wholly circumstantial."  *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984).  Moreover, "circumstantial evidence alone can sustain a guilty verdict[, and it] need not remove every reasonable hypothesis except that of guilt."  *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007) (emphasis omitted) (quoting *Stone*, 748 F.2d at 362).

*1.  Counts 38-58: Health Care Fraud in Violation of 18 U.S.C. § 1347*

To obtain a conviction for health care fraud under 18 U.S.C. § 1347, the Government is required to prove beyond a reasonable doubt that Martinez: "(1) knowingly devised a scheme or artifice to defraud a health care benefit program in connection with the delivery of or payment for health care benefits, items, or services; (2) executed or attempted to

execute this scheme or artifice to defraud; and (3) acted with intent to defraud."[1] *Hunt*, 521 F.3d at 645 (internal quotations omitted). After reviewing evidence adduced at trial in the light most favorable to the Government, we conclude that a rational jury could have found beyond a reasonable doubt that Martinez violated § 1347.

First, we note that, contrary to Martinez's argument, the lack of individualized patient testimony for each count in the indictment alone does not render the evidence before the court insufficient. *See United States v. Clark*, 26 F. App'x 422, 431 (6th Cir. 2001) (relying on expert testimony instead of patient testimony to establish health care fraud under § 1347). If expert testimony is offered in lieu of patient testimony, the expert testimony should be sufficiently specific to the patient, date, and services in the indictment, but the patients' names need not be specifically mentioned during the expert's testimony. *Id.*; *cf. United States v. Tran Trong Cuong*, 18 F.3d 1132, 1141 (4th Cir. 1994) (finding evidence insufficient to support a doctor's conviction on eighty counts for drug distribution outside the usual course of medical practices and for other than legitimate medical purposes where the convictions were based on a medical expert's summary report of thirty-three patient files that were not related to the patients listed in the eighty-count indictment). Accordingly, we must determine whether the evidence submitted is sufficient to support Martinez's health care fraud conviction, even though the Government did not offer individualized patient testimony.

We conclude that substantial and competent evidence supports the conclusion that Martinez executed a scheme to defraud a health care benefit program by the means alleged (the second element of § 1347). The jury heard evidence that between 1998 and

---

[1] 18 U.S.C. § 1347 is titled "Health care fraud," and states in relevant part:

> Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice - -
>> (1)    to defraud any health care benefit program; or
>>
>> (2)    to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
>
> in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

2004, Martinez obtained millions of dollars from Medicare, Medicaid, BWC, and private insurers by submitting fraudulent claims for office visits and injections. The Government presented the billing codes that Martinez submitted for reimbursement for each day listed in the indictment, the patients' files, and testimony from Dr. Kennedy that Martinez could not have conducted the number of procedures and consultations for which he billed. The jury heard evidence that Martinez routinely saw more than sixty patients, and often more than 100 patients in a day. Additionally, the jury reviewed video and audio recordings that demonstrated the brief amount of time that Martinez was physically present with each patient and heard testimony that the billing codes submitted required a more thorough office visit than the recordings demonstrated. The jury also heard testimony that Martinez's jabbing techniques could not have possibly served as legitimate injections. Moreover, Dr. Kennedy testified that Martinez's prescription practices for controlled substances was outside the bounds of accepted medical practice. Last, the jury was presented with sufficient evidence to support an inference that Martinez was perpetuating a fraud when he gave injections with such frequency. This inference is supported by the testimony of Dr. Kennedy and Dr. Parran, who explained that the frequency of injections was so high as to endanger the health of the patients. Both physicians testified that the injections were performed as part of a "standard" rather than an "individualized" treatment plan. The doctors also testified that many of the injections for which Martinez billed were not performed, or, if performed, were not medically necessary. Taken together, a jury easily could have inferred from this evidence that the bills submitted were part of a scheme to defraud the medical benefit programs. *See United States v. Canon*, 141 F. App'x 398, 405 (6th Cir. 2005) (upholding doctor's conviction under 18 U.S.C. § 1347 because government witness testified that patient records did not support the doctor's use of billing codes and "a rational jury could infer a failure to perform from a failure to document").

Second, we conclude that there is sufficient evidence to support the jury's determination that Martinez knowingly devised a fraud scheme (the first element of § 1347) and that Martinez acted with the intent to commit fraud (the third element of § 1347). Martinez's records for each patient named in the indictment and the claims that

Martinez submitted for reimbursement were admitted into evidence and available to the jury for review. Dr. Kennedy testified that he reviewed the bills Martinez submitted and his patient files, (JA 1266-68, 1274-78), and concluded that the billing was "not appropriate in any fashion" and that the procedures claimed in the billing were "not medically necessary in any way." (J.A. 1359-60.) Considering the evidence that Martinez performed procedures and prescribed medication that expert witnesses deemed medically unnecessary, a rational jury could infer that Martinez knowingly devised a billing scheme with the intent to defraud. We, therefore, conclude that there is sufficient evidence to support Martinez's conviction for health care fraud under 18 U.S.C. § 1347.

> *2. Counts 13-37: Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341 and 1343*

18 U.S.C. § 1341 prohibits the use of the mail to execute a scheme to defraud.[2] To convict Martinez of mail fraud under 18 U.S.C. § 1341, the Government was required to prove beyond a reasonable doubt: "(1) a scheme to defraud, and (2) [that Martinez caused] the mailing of a letter, etc., for the purpose of executing the scheme." *Pereira v. United States*, 347 U.S. 1, 8 (1954); *see also Bender v. Southland Corp.*, 749 F.2d 1205, 1215-16 (6th Cir. 1984). One "causes" the mails to be used where he or she "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." *Pereira*, 347 U.S. at 8-9. "The federal statute prohibiting mail fraud parallels section 1343." *United States v. Griffith*, 17 F.3d 865, 874 (6th Cir. 1994) (citing 18 U.S.C. § 1343). Indeed, the elements of § 1341 and § 1343 are nearly identical. To obtain a conviction under § 1343, the Government must prove beyond a reasonable doubt: "(1) a scheme or artifice to defraud; (2) use of interstate wire communications in

---

[2]18 U.S.C. § 1341, entitled "Frauds and swindles," states in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do . . . knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

furtherance of the scheme; and (3) intent to deprive a victim of money or property."[3] *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003) (quoting *United States v. Prince*, 214 F.3d 740,747-48 (6th Cir. 2000)).  Moreover, the first element of each section (scheme to defraud) parallels, in part, the first element of health care fraud under § 1347. *See* 18 U.S.C. § 1347.

As we have already noted, the Government presented sufficient evidence from which a rational jury could find the first element (a scheme to defraud) and the third element (intent to defraud) of both mail and wire fraud.  Thus, for purposes of determining sufficiency of the evidence, we need only determine whether evidence existed from which a rational jury could conclude that Martinez used the mail and wire communications for each of the specified underlying fraud counts. *See* 18 U.S.C. §§ 1341, 1343.  We also note that Martinez does not challenge the sufficiency of the evidence as to the second element of each crime—that he caused the allegedly fraudulent bills to be mailed or transmitted by wire communications.  As such, Martinez has forfeited any challenge to the sufficiency of the evidence for this element. *United States v. Crozier*, 259 F.3d 503, 517 (6th Cir. 2001) (citing *United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999)) (noting that arguments not developed on appeal are deemed forfeited).  Accordingly, we conclude that there is sufficient evidence for a jury to conclude that Martinez committed mail and wire fraud.

---

[3]18 U.S.C. § 1343, entitled "Fraud by wire, radio, or television," states in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce, any writings . . . for the purpose of executing such scheme or artifice shall be fined under this title or imprisoned not more than 20 years, or both.

*Id.*

### 3.  Counts 59 and 60: Health Care Fraud Resulting in Death in Violation of 18 U.S.C. § 1347(2)

Finally, Martinez appeals his conviction under 18 U.S.C. § 1347(2), which contains enhanced penalties in the event that a doctor's health care fraud results in the death of a patient.  Section 1347(2) states, in relevant part: "[I]f the violation results in death, such person shall be fined under this title, or imprisoned for any term of years or for life, or both."  As addressed above, there is sufficient evidence to support a rational jury's conviction of Martinez for health care fraud under § 1347.  At trial, the Government proceeded under the theory that Martinez's prolonged fraudulent treatment, rather than any single treatment or dose, resulted in John Lancaster's and Blair Knight's deaths.  Martinez, however, argues that the Government failed to show that a rational jury could find that he caused their deaths.  Thus, the standard of causation required to show that such fraud "result[ed] in death" becomes important in determining whether there is sufficient evidence to support Martinez's conviction as to these two counts.  This is an issue of first impression in this Circuit.[4]

### a.        Required causation under 18 U.S.C. § 1347(2)

Section 1347 does not indicate the level of causation required to support application of its enhanced penalties, but other federal statutes elevate punishment when certain willful crimes "result in death."  In particular, 18 U.S.C. § 242 allows for a life sentence if death results from certain intentional civil rights violations.  In *United States v. Marler*, the First Circuit determined that § 242's requirement for enhanced punishment is met when the defendant's willful violation of the statute is a "proximate cause" of the victim's death, concluding that proximate cause can be demonstrated where death was the "natural and foreseeable" result of the defendant's conduct.  756 F.2d 206, 215-16 (1st Cir. 1985); *see also United States v. Woodlee*, 136 F.3d 1399,

___

[4]Although we are the first circuit court to consider what level of causation is required under the statute, the Eleventh Circuit has considered whether evidence sufficiently supported a conviction for health care fraud "[resulting] in bodily injury or death" under 18 U.S.C. § 1347, *see United States v. Merrill*, 513 F.3d 1293, 1298-99 (11th Cir. 2008), and several district courts have examined whether allegations were sufficient to support an indictment under that provision.  *See United States v. Salko*, No. 1:07-CR-0286, 2008 U.S. Dist. LEXIS 65211, at *17 (M.D. Pa. Aug. 26, 2008)*; United States v. Mermelstein*, 487 F. Supp. 2d 242 (E.D.N.Y. 2007).  However, none of those courts has specifically construed the meaning of the "result[ed] in death" language.

1405 (10th Cir. 1998) (holding that "the bodily injury element of the felony crime is satisfied if injury was a foreseeable result of the" defendants' violation of 18 U.S.C. § 254(b)); *United States v. Harris*, 701 F.2d 1095, 1101 (4th Cir. 1983) (holding that the "if death results" language of 18 U.S.C. § 241 requires only that death is foreseeable and naturally results from violating the statute); *United States v. Guillette*, 547 F.2d 743, 749 (2d Cir. 1976) (holding that life imprisonment may be imposed if death results from violations of 18 U.S.C. § 241 when the defendant's violation of that statute is a proximate cause of the victim's death).

Although we have not interpreted the "results in death" language of § 242, in *United States v. Wiegand*, we interpreted what level of causation is required to show "if bodily injury results" under 42 U.S.C. § 3631. No. 93-1735, 1994 U.S. App. Lexis 37209, at *7 (6th Cir. Dec. 22, 1994). Section 3631 imposes a maximum one-year sentence for interfering with an individual's housing rights "because of [the individual's] race." 42 U.S.C. § 3631(a). If, however, bodily injury results, the offense becomes a felony and is punishable for up to ten years in prison. *Id.* We upheld the enhanced punishment because the bodily injury that occurred was the "natural and foreseeable" result of the defendant's violation of the statute. In coming to this conclusion, we explained "[a] fundamental principle of criminal law": "[A] person is held responsible for all consequences proximately caused by his criminal conduct. Thus, where events are foreseeable and naturally result from one's criminal conduct, the chain of legal causation is considered unbroken . . . ." *Wiegand*, 1994 U.S. App. Lexis 37209, at *7 (internal quotation omitted).

Additionally, in determining that proximate cause was the appropriate causation requirement under 18 U.S.C. § 242, the First Circuit in *Marler* reasoned that "[w]hen the Congress provided that [a violation] resulting in death may be punished by life imprisonment, we must consider it to have been fully cognizant of the principles of legal causation." 756 F.2d at 216. The same is true here. Congress was aware of principles of legal causation when it determined that a health care fraud "violation [that] results in death" warrants an enhanced penalty. *See* 18 U.S.C. § 1347. We also note that the parties do not challenge the district court's determination that proximate cause is the

appropriate standard of causation, and the jury instructions required the jury to find that Martinez was the proximate cause of the death of the two patients in order to convict him of health care fraud resulting in death.[5] We therefore conclude that proximate cause is the appropriate standard to apply in determining whether a health care fraud violation "results in death."

> b.     *Sufficiency of the evidence to convict Martinez of health care fraud "resulting in death"*

Martinez argues that there is insufficient evidence to conclude that he proximately caused the deaths of Lancaster and Knight. As we have already determined, the evidence sufficiently demonstrated that Martinez committed fraud when he treated patients by hurriedly giving them injections and prescriptions rather than taking sufficient time to provide his patients with individualized care; the issue of whether Martinez was the proximate cause of his two patients' deaths is a closer question. Our decision, however, is guided by the deference we must give to the jury's verdict. We must review the relevant evidence in the light most favorable to the Government and must affirm Martinez's conviction if any rational trier of fact could find that he was the proximate cause of Lancaster's and Knight's deaths. *Jackson*, 443 U.S. at 319. "This standard is a great obstacle to overcome, and presents the appellant in a criminal case with a very heavy burden." *United States v. Matthews*, 298 F. App'x 460, 464 (6th Cir. 2008) (internal citations omitted). Thus, in undertaking our review of the jury's finding that Martinez was the proximate cause of the two patients' deaths, we cannot "substitute [our] judgment for that of the jury." *Id.*

---

[5]During the trial, the jury was instructed that to convict Martinez of health care fraud resulting in death, it had to find that Martinez's fraud was the "proximate or direct cause" of the two patients' deaths. According to the instructions, "proximate or direct cause exists where the acts of the Defendant in committing healthcare fraud in a natural and continuous sequence directly produces the deaths and without which they would not have occurred." (JA 807.) The court also explained that Martinez is not responsible for the deaths of Lancaster and Knight if Martinez's alleged commission of health care fraud was a remote cause of their deaths, i.e., if "the result could not have been reasonably foreseen or anticipated as being the likely cause of the deaths." (JA 807-08.) The jury was further instructed that proximate cause does not exist "when another's act, which could not have been reasonably foreseen and is fully independent of [Martinez's] alleged healthcare fraud, intervenes and completely breaks the effect of [Martinez's] conduct." (JA 808.)

Our decision is also guided by the principles of proximate cause. "The concept of proximate cause incorporates the notion that an accused may be charged with a criminal offense even though his acts were not the immediate cause of the victim's death or injury." *Guillette*, 547 F.2d at 749. "In many situations giving rise to criminal liability," the harm "is not directly caused by the acts of the defendant but rather results from intervening forces or events." *Id.* "Where such intervening events are foreseeable and naturally result from [the defendant]'s criminal conduct," the defendant is "criminally responsible for the resulting harm." *Id.*; *see also Hoopengarner v. United States*, 270 F.2d 465, 469 (6th Cir. 1959) (holding defendant culpable for the "natural and probable consequence[]" of his conduct). Therefore, even if Martinez did not intend for his two patients to die, he can be held responsible for their deaths if there was sufficient evidence that it "reasonably might or should have been foreseen . . . that [his fraudulent conduct] would be likely to create a situation which would expose another to the danger of . . . death." *Id.*; *see also Harris*, 701 F.2d at 1102 (holding that "if death results" requirement under § 241 satisfied because death was "a foreseeable and natural result" of defendant's actions).

### *i. John Lancaster*

The evidence presented is sufficient for a rational jury to conclude that Lancaster's death was a reasonably foreseeable consequence of Martinez's fraudulent treatment. The evidence demonstrates that Martinez treated Lancaster nearly every week from January 1999 until September 2001, providing him with excessive injections and prescriptions, inadequately monitoring him, and failing to provide him with individualized care. During this period of time, Lancaster's health deteriorated from that of a relatively healthy and well-adjusted, albeit injured, individual to a moody, abusive, and angry individual who no longer worked. There was sufficient evidence for a rational jury to infer that Martinez's treatment of Lancaster enabled and exacerbated Lancaster's addiction to controlled substances. Moreover, Lancaster's wife, Karen Lancaster, testified that she told Martinez that Lancaster had become addicted to drugs and that Martinez responded by becoming "defensive and very angry." (JA 2380-83.) Additionally, notes in Lancaster's file indicated that Martinez's staff was aware that

Lancaster was at risk of becoming an addict and that he had been dismissed as a patient by other doctors because of his dependency on prescription drugs. One note in Lancaster's file indicated that he had either used or sold heroin, OxyContin, and Valium, and another note on a patient sign-in sheet identified Lancaster as an addict. Even Martinez's own expert, Dr. Stinson, testified that such signals would lead any "reasonable" doctor to cease providing drugs to Lancaster.

Despite the warning signs, Martinez did not alter his treatment of Lancaster—including the last time Martinez treated Lancaster. Lancaster's wife testified that on September 4, 2001, Lancaster had recently been released from jail, where he had not taken any pain medication. She also testified that her husband was very weak and had lost weight. At Lancaster's last appointment with Martinez on September 5, 2001, Lancaster was shaky, loud, and complaining of severe pain because he was suffering withdrawal symptoms. Martinez provided Lancaster with prescriptions for Kadian, Vicodin, and Valium, all of which Lancaster filled on that day. On the day before Lancaster's death, September 12, 2001, Martinez billed insurance carriers for twelve injections to Lancaster, although it is not clear that the billed-for injections were actually given on September 5, 2001. Additionally, Martinez submitted the standard report to BWC for payment indicating that Lancaster had no complications from the injections, made a good recovery, and was discharged in "good condition."

The record demonstrates, however, that Lancaster was in anything but "good condition." Records of Lancaster's office visit show that Lancaster was loud and shaky, that Martinez may have slapped Lancaster to calm him down, and that Lancaster took a four-hour nap on the examination table following the injections. Less than thirty-six hours after his appointment with Martinez, Lancaster was found unconscious, and he died less than one week later from aspiration pneumonia caused by a drug overdose. Lancaster's urinary drug screen tested positive for opiates, which include Kadian and Vicodin; and benzodiazepines, which include Valium and cocaine. There is also evidence that Lancaster had ingested heroin and cocaine, but tests were inconclusive as to what drugs actually killed him. However, hospital records indicate that, on the afternoon before he was admitted, Lancaster told his wife that he took three Kadian pills

at once.  Records also show that Lancaster filled his final Kadian prescription from Martinez, and Lancaster had not received a Kadian prescription from any other physician for two months before his death.  In addition, Dr. Kennedy testified that Martinez's entire course of treatment of Lancaster was a "very strong factor" in Lancaster's death, and that at Lancaster's last appointment, Martinez "sent him home with medications . . . that contributed directly to his death." (JA 1432-35.)  Dr. Parran likewise concluded that Martinez's prescriptions were outside the bounds of medical practice and given for no legitimate purpose.

Viewing the evidence in the light most favorable to the Government, a rational jury could have concluded that Lancaster's death was a foreseeable result of Martinez's conduct.  Martinez over-prescribed controlled substances that led to Lancaster's addiction to narcotics, and Martinez continued to perform unnecessary injections and prescribe harmful medications despite the presence of the clear "red flags" of escalating addiction.  A rational jury could have found that the evidence demonstrates the fraud for which Martinez was convicted—providing poor, inattentive treatment while billing for quality treatment and excessive, highly-reimbursed nerve-block injections and prescriptions—proximately caused Lancaster's death.  Thus, there is sufficient evidence for the jury to conclude that Lancaster's death by overdose was a reasonably foreseeable result of Martinez's conduct. *Cf. Merrill*, 513 F.3d at 1298-99 (holding that although patients had other illegal substances in their systems when they died, sufficient evidence existed for a reasonable jury to conclude that the physician's fraudulent prescriptions caused their deaths because the additional drugs found in their system were the same type as those prescribed by the physician).

In an attempt to break the chain of causation, Martinez argues that Lancaster's use of illegal narcotics constitutes an intervening cause relieving Martinez of criminal culpability.  This argument fails.  "An intervening act is a coincidence when the defendant's act merely put the victim at a certain place at a certain time, and because the victim was so located it was possible for him to be acted upon by the intervening cause." Wayne R. LaFave, 1 Substantive Crim. L. § 6.4 (f)(3) (2d ed. 2008) (emphasis omitted).  But, "an intervening act may be said to be a response to the prior actions of the

defendant when it involves reaction to the conditions created by the defendant." *Id.* (emphasis omitted); *Guillette*, 547 F.2d at 749 ("The concept of proximate cause incorporates the notion that an accused may be charged with a criminal offense even though his acts were not the immediate cause of the victim's death or injury."). Accordingly, where "intervening events are foreseeable and naturally result" from a defendant's criminal conduct, "the chain of legal causation [is] unbroken" and the law "holds the [defendant] criminally responsible for the resulting harm." *Guillette*, 547 F.2d at 749. Because "the perimeters of legal cause are more closely drawn when the intervening cause was a matter of coincidence rather than response," an unforeseeable coincidence will break the chain of legal cause, but a response will only do so if it is abnormal. LaFave, 1 Subst. Crim. § 6.4(f)(3).

Here, Martinez was not convicted of being the immediate cause of his patients' deaths but of fraudulently performing unnecessary medical services that led to his patients' deaths. The jury could have concluded that Martinez's treatment enabled and exacerbated Lancaster's addiction, and that, given that addiction, the overdose was a natural and reasonably foreseeable result. *See* LaFave, 1 Subst. Crim. § 6.4(h) (noting that with respect to felony murder, "self-inflicted harms attributable to the victim's weakened condition[] are quite normal and thus do not break the causal chain"). Moreover, the jury was given an intervening-cause instruction. They were instructed that they could not convict Martinez if they found that the cause of the two patients' deaths was reasonably foreseen and independent of Martinez's alleged health care fraud. We must presume that the jury followed the instructions unless we have evidence to the contrary. *See Washington v. Hofbauer*, 228 F.3d 689, 706 (6th Cir. 2000). Because a rational jury could have found that the addiction and overdose were sufficiently linked, we must defer to the jury's reasonable judgment that the chain of legal causation was not broken. Our deferential standard of review requires that we not displace the jury's verdict when Lancaster's actions as an addict cannot to be said to break the chain of proximate causation. *See Molton v. City of Cleveland*, 839 F.2d 240, 248 (6th Cir. 1988) (holding that suicide of prisoner in police custody was a foreseeable consequence under

the circumstances and, therefore, not an independent intervening cause breaking the chain of proximate causation).

### ii. Blair Knight

As with Lancaster, there is no evidence that a prescription written by Martinez directly caused Knight's death, but there is sufficient circumstantial evidence to allow a rational jury to conclude that Martinez proximately caused his death. Before his death, Knight was Martinez's patient for sixteen months, and evidence supports a conclusion that Martinez fraudulently treated Knight in a manner similar to that of other patients. Evidence at trial demonstrated that, over the course of Knight's treatment by Martinez, Knight's health deteriorated such that he was bloated, unresponsive, and immobile. As with Lancaster, there were "red flags" that Martinez's treatment was enabling and exacerbating Knight's addiction to controlled substances. There were notes in Knight's charts indicating that Martinez's staff was aware of Knight's addiction and that Knight's treatment was harming him, including notes that his speech was "slurred and slow," that Knight had trouble walking due to the lack of feeling in his leg, and that he was failing to follow the doctor's prescribing orders. A January 3, 2001, letter in Knight's patient file indicated that Knight was being treated at a drug rehabilitation facility. Moreover, an August 29, 2000, note in Knight's patient chart stated that Knight was taking "double the number" of OxyContin pills that Martinez prescribed, and that his speech was "slurred and slow"—indicating overuse of the drug. (JA 1446-47, 3625.) And, as with Lancaster and Martinez's other patients, there is no indication that Martinez provided individualized treatment or appropriately responded to these red flags but, instead, continued to provide Knight with prescriptions and injections.

During the two weeks preceding Knight's death, he twice visited Martinez in extreme pain. Knight was so bloated that he could not wear socks or shoes and was covered in a red rash. Nonetheless, Martinez's office notes show that Knight received the "standard treatment," and the notes contain the same generic statements indicating that all was going well. There is no evidence that Martinez altered his treatment of Knight even though these were indications of drug misuse. Knight died of a drug

overdose on the same day as his last visit with Martinez. Toxicology reports indicate that Knight overdosed on OxyContin pills from an unknown source, as well as hydrocodone and Valium. The jury heard evidence that when Knight was transported to the hospital, he had green-colored medicine in his mouth and nose, and that OxyContin tablets are green or bluish green. During that last office visit, Martinez prescribed OxyContin and Endodan, and pharmacy records show that Martinez was the only doctor who prescribed OxyContin to Knight shortly before his death.

There is no definitive evidence that Martinez prescribed the drugs in Knight's system at the time of his death. Nonetheless, there is sufficient evidence that Martinez's overall course of treatment proximately caused Knight's death. Dr. Kennedy testified that Martinez's entire course of treatment of Knight "contributed largely" to Knight's death. The jury heard evidence that Knight became addicted to narcotics as a result of Martinez's fraudulent prescriptions and injections. Dr. Kennedy suggested that Martinez should have monitored Knight's addiction and provided him with medication only under the supervision of an addiction specialist. He also testified that Martinez continued to feed Knight's addiction in order to get Knight to "come in and get [billable] procedures." (JA 1457.) Similarly, Dr. Parran testified that "any reasonable physician should [have known] that this patient has an addiction problem" and should have known that continued prescriptions would create a risk of overdose. (JA 2118-19.) Based on this evidence, a reasonable jury could have inferred that Martinez furthered Knight's addiction to advance his fraudulent billing scheme and that Knight's subsequent misuse of prescribed substances was a foreseeable result of that addiction. Viewing the evidence in the light most favorable to the Government, a rational jury could have concluded that Knight's overdose was the reasonably foreseeable result of Martinez's conduct.

## C. Admissibility of Dr. Parran's testimony

Related to the issue of causation, Martinez contends that the district court erred in admitting testimony from Dr. Parran, an addiction specialist who teaches at Case Western Reserve School of Medicine. Dr. Parran testified that the drugs prescribed by

Dr. Martinez caused the deaths of Lancaster and Knight.  Martinez objected to Dr. Parran's testimony at trial, but the district court overruled the objection.  On appeal, Martinez argues that the court impermissibly allowed Dr. Parran to speculate as to the causes of Lancaster's and Knight's deaths.

We review the district court's ruling admitting or excluding expert testimony under an abuse-of-discretion standard.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999).  Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under Rule 702, the district court must examine the expert witness's testimony for reliability and relevance.  Our review of the district court's admission of expert testimony must "focus, of course, [] solely on principles and methodology, not on the conclusions that they generate," *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993), and we must confirm that the "factual underpinnings of the expert's opinions were sound," *Greenwell v. Boatwright*, 184 F.3d 492, 498 (6th Cir. 1999).  However, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

At trial, Dr. Parran testified that Lancaster's overdose resulted from medication prescribed by Martinez, but on cross-examination he testified that he could not say "beyond a reasonable doubt" that the medicine prescribed caused Lancaster's death. (JA 2231.)  With respect to Knight's death, Dr. Parran testified that the prescription from Martinez "directly and causally contributed," such that "if it [had not] been for" that prescription, Knight would not have overdosed.  (JA 2219.)  First, we observe that this testimony was not admitted in error because it is more than the sort of "unsupported

speculation" that is prohibited, as it was based on Parran's examination of the toxicology reports and the patients' files. *See McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (noting that an "expert's conclusions regarding causation must have a basis in established fact and cannot be premised on mere suppositions," and if "based on assumed facts, must find some support for those assumptions in the record"). Thus, we conclude that Dr. Parran's testimony was not admitted in error.

Further, the jury was instructed to consider whether the "course of treatment" proximately caused the deaths of Lancaster and Knight—not simply whether the oral prescriptions themselves resulted in their deaths. Given the evidence from which a rational jury could find that Martinez's "course of treatment" proximately caused the deaths of Lancaster and Knight, we also conclude that any error in admitting Parran's testimony was harmless. *Baker*, 458 F.3d at 520.

**D. Sentencing**

*1. Standard of review*

Martinez argues that his sentence was both procedurally and substantively unreasonable and that the district court's loss calculation used to set the appropriate amount of restitution was not supported by the evidence. We review challenges to the district court's sentencing determinations for reasonableness under an "abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 56 (2007); *Rita v. United States*, 551 U.S. 338, 361 (2007); *United States v. Booker*, 543 U.S. 220, 261 (2005). The reasonableness inquiry has both procedural and substantive components. *United States v. Caver*, 470 F.3d 220, 248 (6th Cir. 2007). Accordingly, "we must 'consider not only the length of the sentence but also the factors evaluated and the procedures employed by the district court in reaching its sentencing determination.'" *United States v. Moon*, 513 F.3d 527, 539 (6th Cir. 2008) (quoting *United States v. Webb*, 403 F.3d 373, 383 (6th Cir. 2005)).

*2. Procedural reasonableness*

Martinez contends his sentence is procedurally unreasonable because the district court failed to: (1) explain the calculation of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range, (2) address Martinez's objections to the Guidelines range as calculated in the Presentence Investigation Report ("PSR"), (3) consider the 18 U.S.C. § 3553(a) factors, and (4) explain the sentence imposed.  Martinez also argues that the district court improperly relied on  the jury's implied findings not contained in the verdict.  In our review of a sentence for procedural reasonableness, we must "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Gall*, 552 U.S. at 51.  "Our 'reasonableness review focuses on the factors listed in § 3553(a), one of which is the Sentencing Guidelines themselves.'"  *Moon*, 513 F.3d at 539 (quoting *United States v. Duckro*, 466 F.3d 438, 442 (6th Cir. 2006)).

We may conclude that a sentence is unreasonable when the district court "fails to 'consider' the applicable Guidelines range or neglects to 'consider' the other factors listed in 18 U.S.C. § 3553(a), and instead simply selects what the judge deems an appropriate sentence without such required consideration."  *Moon*, 513 F.3d at 539 (citing *United States v. Jones*, 489 F.3d 243, 250-51 (6th Cir. 2007)).  The § 3553(a) factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the appropriate advisory guideline range; (5) any other pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

*Caver*, 470 F.3d at 248 (quoting 18 U.S.C. § 3553(a)). "[T]he district court need not 'engage in a ritualistic incantation' of the § 3553(a) factors," but its decision should be "sufficiently detailed to reflect the considerations listed in § 3553(a)" to permit meaningful appellate review. *Moon*, 513 F.3d at 539 (quoting *United States v. McBride*, 434 F.3d 470, 474 (6th Cir. 2006)). "The district court's [decision] must also provide some indication that the court considered the defendant's arguments in favor of a lower sentence and the basis for rejecting such arguments." *Id*. (citing *Jones*, 489 F.3d at 250-51).

At the sentencing hearing, the district court made an "initial" finding that "there is a total offense level of 43 with a Criminal History Category I," and then explained the sentences that this calculation "initially" allowed for under each of the counts. (JA 870.) This calculation was the same as that reached in the PSR, a range to which Martinez objected both in writing and at his sentencing hearing. According to the PSR, this calculation was reached in the following manner: The base level offense was 7, 24 additional levels were added for a loss of more than $50 million, 2 additional levels were added because the offense involved conscious or reckless risk of death, 2 additional levels were added because the offense involved sophisticated means, 6 additional levels were added because the offense involved 250 or more victims, 2 additional levels were added because the victims were vulnerable, 4 additional levels were added because Martinez was the organizer and leader of extensive criminal activity, and 2 additional levels were added because Martinez was in a position of trust. This resulted in an offense level of 49, which was adjusted downward to the maximum offense level of 43, resulting in an advisory Guidelines sentence of life imprisonment.

In his objections to the PSR, Martinez objected to this calculation for a variety of reasons. However, at sentencing, his objection focused on the district court's method-of-loss calculation and the enhancement for vulnerable victims. Martinez's brief addresses only the district court's calculation of loss. Therefore, Martinez has forfeited any other challenge to the Guidelines calculation. *Crozier*, 259 F.3d at 517.

### a. Loss calculation

Martinez argues that the court calculated the loss caused by his crimes incorrectly. We disagree. As an initial matter, we note that the district court explained the method used to calculate the loss caused by Martinez's crimes, and we review a district court's calculation of the amount of loss for clear error. *United States v. Blackwell*, 459 F.3d 739, 772 (6th Cir. 2006). In order to challenge this calculation, Martinez must "carry the burden of demonstrating 'that the court's evaluation of the loss was not only inexact but outside the universe of acceptable computations.'" *United States v. Raithatha*, 385 F.3d 1013, 1024 (6th Cir. 2004), *vacated and remanded on other grounds*, 543 U.S. 1136 (2005) (quoting *United States v. Tardiff*, 969 F.2d 1283, 1288 (1st Cir. 1988)). When determining the amount of loss for sentencing purposes, "a defendant will be held accountable for the actual or intended loss to a victim, whichever is greater, or a combination thereof." *Id.* (citing *United States v. Wade*, 266 F.3d 574, 586 (6th Cir. 2001)); *see also* U.S.S.G. § 2B1.1, cmt. n.3(A)(ii). Moreover, "[s]o long as the intended loss is supported by a preponderance of the evidence, the district court may use it in reaching the appropriate offense level." *Raithatha*, 385 F.3d at 1024 (quoting *United States v. Logan*, 250 F.3d 350, 371 (6th Cir. 2001)). Following a verdict, restitution is properly ordered in the full amount of each victim's loss. *See* 18 U.S.C. § 3664(f)(1)(A). "The term 'victim' is defined as 'a person directly and proximately harmed by a defendant's offense.'" *Hunt*, 521 F.3d at 648 (quoting 18 U.S.C. § 3663A(a)(2)).

During the sentencing hearing, the court questioned the parties regarding loss calculation. Martinez argued that the amount would properly be calculated at approximately $45,000 because that was the loss corresponding to the exact charges on the indictment. The court, in turn, articulated the Government's position and said that "the treatment that was given" and "the bills that were either submitted or intended to be submitted" by Martinez were not for medical treatment, and therefore all the bills that Martinez submitted were "properly covered" in the calculation of intended loss. (JA 888.) The Government supplemented this explanation, noting that all of the fraud counts included an allegation that Martinez "devise[d] a scheme to defraud," and that the

Government presented proof that the scheme ran from January 1998 until September 2004. (JA 893-894.) Because the charges referred not only to the specific charges in the indictment, but also to the entire scheme underlying the fraud, the total intended loss connected to the wire and mail fraud was properly included, resulting in an actual loss of more than $12,337,230 for payments actually made to Martinez and an intended loss of $60,799,000 for bills submitted by Martinez. These calculations were supported by the testimony of representatives from BWC, Medicare, and Medicaid concerning the amounts Martinez billed them and the payments Martinez received; by the expert testimony of statistician Dr. Michael Nowak, who presented these calculations during trial; and by the testimony of Dr. Kennedy, who examined the patient files and bills submitted by Martinez.

"Because [the health care benefit programs] would not have paid for [the procedures] but for the presence of [Martinez's] signature on the orders, [Martinez] was the direct and proximate cause of the harm suffered by those entities." *Hunt*, 521 F.3d at 648. Thus, the district court did not commit error when it accepted the reimbursement amounts over the years which Martinez was committing the fraud when it ordered restitution. Further, it is appropriate for the court to consider the nature of the fraud in determining whether the loss amount should be limited to the specific losses testified to or to an amount derived from the nature of the fraud. *Id.* (rejecting defendant's argument that only the specific amounts proven could be included in the loss calculation, and accepting estimates for loss based on the Government's sample and average figures provided by the insurance companies). Because the district court did not err in including the total amount of intended loss in its calculation, Martinez cannot show that the calculation of loss was incorrect.

### b. *The district court's consideration of the 18 U.S.C. § 3553(a) factors*

The court also recognized that the Guidelines are advisory and noted that it had reviewed all of Martinez's objections to the PSR. Here, the district court gave both parties an opportunity to argue for what they deemed an appropriate sentence—Martinez argued for a sentence of "time served," and the Government argued for a sentence within

the Guidelines.  Following a lengthy presentation by the Government of documents in support of a Guidelines sentence in this case, the district court gave Martinez an opportunity to argue for a downward variance.  Martinez asked the court not to impose a "draconian" penalty and professed his innocence, arguing that his actions were merely an attempt to relieve his patients' pain.  Martinez also disclaimed responsibility for the deaths of Lancaster and Knight, contending that he was not responsible for their drug overdoses.  He further requested leniency, arguing that a lower sentence was warranted based on his years of service to his patients and his status as a non-citizen.

The record reflects that the district court considered and rejected Martinez's arguments.  The court's reasoning in doing so was "sufficiently detailed to reflect the considerations listed in § 3553(a) and to allow for meaningful appellate review." *United States v. Mayberry*, 540 F.3d 506, 518 (6th Cir. 2008) (internal quotation marks omitted).  Although the court acknowledged that some patients were satisfied with the care provided by Martinez, it found that he had hurt many more.  In response to Martinez's argument that the Guidelines sentence was "draconian," the court explained:

> [P]eople who were helpless came to [Martinez] as their last hope, and [he] didn't treat them according to medical standards; [he] . . . continued their addiction to narcotic drugs, and [he] didn't get them better; they only got worse.  And during this course of treatment, at least two people died as a result of the fraud and distribution of drugs.  That being the case, the sentences don't seem to be draconian.

(JA 932.)  The court also remarked, "the point is, [Lancaster and Knight] came, sought treatment, and they were in desperation, and [] you continued to prescribe drugs that would continue [their] downward spiral, that resulted in [their overdoses], and that's why you are responsible [for their deaths]."  (JA 933-34.)  Before announcing Martinez's life sentence, the court stated that it was relying on the findings that it had made under 18 U.S.C. § 3553(a).  Although the district court did not address Martinez's pleas for a lower sentence based on his years of service to his patients and his status as a non-citizen, its failure to do so is not procedurally unreasonable.  *See United States v. Liou*, 491 F.3d 334, 339 n.4 (6th Cir. 2007) (noting that "a district court's failure to

address each argument [of the defendant] head-on will not lead to automatic vacatur" (citing *Rita v. United States*, 551 U.S. 338, 358 (2007))).

### 3. *Substantive reasonableness*

In addition to procedural reasonableness, we must determine whether Martinez's sentence is substantively reasonable. *United States v. Webb*, 403 F.3d 373, 383 (6th Cir. 2005). A sentence may be substantively unreasonable where the district court "'select[s] the sentence arbitrarily, bas[es] the sentence on impermissible factors, fail[s] to consider pertinent § 3553(a) factors or giv[es] an unreasonable amount of weight to any pertinent factor.'" *United States v. Collington*, 461 F.3d 805, 808 (6th Cir. 2006) (quoting *Webb*, 403 F.3d at 383). We have held that sentences within a properly calculated Guidelines range are afforded a rebuttable presumption of reasonableness, and the defendant bears the burden of rebutting this presumption. *Caver*, 470 F.3d at 247 (citing *United States v. Williams*, 436 F.3d 706, 708 (6th Cir. 2006)). Martinez has failed to rebut that presumption, and we conclude that his sentence is substantively reasonable.

## E.    **Martinez's Pro Se Claims**

Martinez raises a number of additional pro se claims, but we decline to address them because he is represented by counsel. *United States v. Howton*, 260 F. App'x 813, 819 (6th Cir. 2008) ("We decline to address [the defendant's pro se] arguments because [the defendant] was represented by counsel in this matter."). Even if we did address such claims, they are without merit.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** Martinez's conviction and sentence.