RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0010p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

No. 15-2234

SANDRA MAXINE WHITE,

*Defendant-Appellant*.

---

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:13-cr-00222—Paul Lewis Maloney, District Judge.

Argued: December 1, 2016

Decided and Filed: January 13, 2017

Before: MOORE and CLAY, Circuit Judges; HOOD, District Judge.[*]

---

## COUNSEL

**ARGUED:** Matthew T. Nelson, WARNER, NORCROSS & JUDD LLP, Grand Rapids, Michigan, for Appellant. Hagen W. Frank, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Matthew T. Nelson, C. Ryan Grondzik, WARNER, NORCROSS & JUDD LLP, Grand Rapids, Michigan, for Appellant. Hagen W. Frank, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

---

[*]The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

1

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.  Sandra White ("White") and her husband Joseph White operated a travel agency.  In order to obtain low airline fares for the agency's clients, White routinely booked military-rate travel for her non-military-member clients.  When airlines became suspicious of White's practices, and asked her for proof of her clients' military status, White manufactured fake military identification cards and sent them to the airlines as alleged proof of her clients' military credentials.  The airlines suspected that the military identification cards were forged and contacted investigators.  After a jury trial, White was convicted of mail fraud and aggravated identity theft, and sentenced to a total of ninety-four months of imprisonment.

White now challenges her conviction and sentence on the basis that (1) the district court read an improper definition of the term "use" into the aggravated identity theft statute; (2) the district court abused its discretion in refusing to admit certain evidence of White's intention to repay some of the airlines' losses; and (3) the district court erred in calculating the amount of White's victims' losses.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  FACTS AND PROCEDURE

Defendant Sandra White and her husband Joseph White owned and operated Corporate Travel Consultants/Travel by Design, Inc. ("CTC") from 1989 through 2011.  R. 89 (Stipulation) (Page ID #480).  The agency's accreditation was revoked in 2003 after audits conducted by United Airlines determined that CTC generally and White specifically had engaged in fraudulent ticketing schemes that cost the airline nearly $100,000 in airfares.  R. 112 (Presentence Investigation Report ("PSR")) (Page ID #572).  White nonetheless continued her work as a travel agent as a subcontractor for other accredited travel agencies throughout the country, enabling her to maintain her practice of acquiring and selling airfares.  *Id.*  White continued to obtain fraudulent ticket fares for her clients by providing false information about her clients' ages,

possession of various discount certificates, and military status.  *Id.*  As a travel agent, White had an opportunity to obtain additional revenue through commissions, service fees, and additional bookings.  R. 143 (Trial Tr. Vol. 4 at 735) (Page ID #1477).  At trial, White's victims testified that she charged service fees and other airfare directly to her clients' credit cards, sometimes for persons other than those specific clients, and sometimes without their permission.  R. 142 (Trial Tr. Vol. 3) (Page ID #1264, 1343–44).

When travel agencies violate an airline's fare policy in a manner that causes the airline financial loss, the airline issues Agency Debit Memoranda ("ADM") detailing the loss and requiring payment to the airline.  R. 112 (PSR) (Page ID #571).  An operator of one of the travel agencies with whom White subcontracted testified at trial that within two years of working with White, the agency received more than $100,000 in ADMs based on airfare that White booked with Delta and United Airlines.  R. 144 (Trial Tr. Vol. 5 at 894–95, 909, 913–14) (Page ID #1636–37, 1651, 1655–56).  During one six-month period between January 1, 2010 and June 30, 2010, one of the travel agencies for which White was a subcontractor saw its percentage of sales resulting in ADMs increase from "[n]ot even a quarter of one percent, less than a half of a percent" to nearly fifteen percent.  *Id.* at Page ID #1654–57.

The fraudulent scheme that is largely at issue in this case concerns White's practice of securing lower rates by falsely informing airlines that her clients were members of the United States Armed Forces.  R. 143 (Trial Tr. Vol. 4) (Page ID #1497–99); R. 144 (Trial Tr. Vol. 5) (Page ID #1656–57).  Because of the volume of White's bookings, airlines and other travel agencies became suspicious.  When White was asked by her subcontracting partners to produce proof that her customers qualified for military discounts, she created false Armed Forces Identification ("AFID") cards using customers' real names and actual dates of birth.  R. 143 (Trial Tr. Vol. 4) (Page ID #1500–1501).  The airlines determined that the cards White manufactured were fraudulent and subsequently notified the United States Secret Service.  R. 139 (Trial Tr. Vol. 1) (Page ID #923–28).

Sandra White was charged with wire fraud in a single-count Indictment on November 7, 2013.  R. 1 (Indictment) (Page ID #1).  On February 27, 2014, the Government filed a First Superseding Indictment charging White with wire fraud and aggravated identity theft. R. 2 (First

Superseding Indictment) (Page ID #9).  In addition, her husband, Joseph White, was charged. The Government offered the Whites a deal wherein White would plead guilty to the wire fraud count and Joseph White would accept a diversionary disposition.  R. 31 (Plea Agreement) (Page ID #77).  Joseph White refused the agreement, and the Whites proceeded toward trial.  Two months before trial, White moved to dismiss Count Two, the aggravated identity theft count, which the government opposed.  R. 53 (Mot. to Dismiss) (Page ID #190); R. 56 (Resp. in Opp.) (Page ID #215).  The district court denied the motion.  R. 148 (Mot. Hr'g) (Page ID #2160–61); R. 63 (Order) (Page ID #242).  White filed a motion for reconsideration immediately before trial, R. 81 (Mot. for Reconsideration) (Page ID #453), and the district court again denied the motion to dismiss Count Two.  R. 91 (Order) (Page ID #484); R. 139 (Trial Tr. Vol. 1) (Page ID #743–745).

During trial, White attempted to offer evidence about her repayment of some of the airlines' and travel agencies' losses that resulted from her scheme.  The district court permitted White to examine witnesses about actual repayments that were made to victims; however, White was not permitted to delve into loss-recoupment negotiations that took place long after White was confronted by her victims.  R. 143 (Trial Tr. Vol. 4) (Page ID #1530–31).

The jury found White guilty on both counts on June 2, 2015.  Joseph White was acquitted.  On September 25, 2015, the court sentenced White to seventy months of imprisonment on Count One and twenty-four months on Count Two, to be served consecutively. R. 121 (Judgment) (Page ID #675).  White filed a timely notice of appeal.

## II.  ANALYSIS

### A.  Standard of Review

Whether the district court properly construed the meaning of the word "uses" within the ambit of 18 U.S.C. § 1028A is a question of statutory construction.  We review issues of statutory interpretation de novo.  *United States v. Miller*, 734 F.3d 530, 539 (6th Cir. 2013).  We also review a district court's denial of a motion to dismiss the indictment de novo.  *United States v. Ali*, 557 F.3d 715, 720 (6th Cir. 2009).

We review a district court's evidentiary rulings for abuse of discretion. *United States v. Freeman*, 730 F.3d 590, 595 (6th Cir. 2013). "An abuse of discretion occurs when a district court relies on clearly erroneous findings of fact, improperly applies the law, or uses an erroneous legal standard." *United States v. Dixon*, 413 F.3d 540, 544 (6th Cir. 2005). "[W]e will leave rulings about admissibility of evidence undisturbed unless we are left with the definite and firm conviction that the [district] court . . . committed a clear error of judgment in the conclusion it reached." *United States v. Wagner*, 382 F.3d 598, 616 (6th Cir. 2004) (internal quotation marks omitted).

"We review a district court's calculation of the 'amount of loss' for clear error, but consider the methodology behind it *de novo*." *United States v. Meda*, 812 F.3d 502, 519 (6th Cir. 2015). We have previously instructed district courts "to determine the amount of loss [under U.S.S.G. § 2B1.1(b)(1)] by a preponderance of the evidence, and the district court's findings are not to be overturned unless they are clearly erroneous." *United States v. McCarty*, 628 F.3d 284, 290 (6th Cir. 2010) (quoting *United States v. Triana*, 468 F.3d 308, 321 (6th Cir. 2006)). "In order to challenge this calculation, [the defendant] must 'carry the burden of demonstrating that the court's evaluation of the loss was not only inexact but outside the universe of acceptable computations.'" *United States v. Martinez*, 588 F.3d 301, 326 (6th Cir. 2009) (quoting *United States v. Raithatha*, 385 F.3d 1013, 1024 (6th Cir. 2004), *vacated and remanded on other grounds*, 543 U.S. 1136 (2005)).

**B. Defining "Use" Pursuant to 18 U.S.C. § 1028A**

White first argues that the district court incorrectly applied Sixth Circuit precedent in holding that "use" of a means identification under 18 U.S.C. § 1028A includes a situation where a defendant purports to act on behalf of another individual by employing that individual's means of identification. Defendant White was found guilty of aggravated identity theft, which is defined by 18 U.S.C. § 1028A(a)(1):

> **(1) In general.**--Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years.

18 U.S.C. § 1028A.  Congress enacted § 1028A in 2004 because at the time, "many identity thieves receive[d] short terms of imprisonment or probation" and "after their release, many of these thieves will go on to use false identities to commit much more serious crimes."  H.R. Rep. No. 108–528, 2004 U.S.C.C.A.N. 779 (2004).  The aggravated identity theft statute "is intended to reduce the incidence of identity theft and fraud and address the most serious criminals by providing stronger penalties for those who would commit such crimes in furtherance of other more serious crimes."  *Id.* at 785.

White's First Superseding Indictment alleged that she "did knowingly use, without lawful authority, means of identification of other persons, to wit, the names of 27 persons for whom she had previously obtained significantly reduced military fares by fraudulently representing that they were members of the Armed Forces of the United States . . . ."  R. 2 (First Superseding Indictment at 7) (Page ID #15).  The Government further alleged that "[White] used the noted means of identification to manufacture fake Armed Forces Identification Cards, which she then sent by means of interstate wire communications to Delta Airlines, Cain Travel, and The Travel Agent Company in an attempt to justify reduced fares that she had previously obtained in the course of committing wire fraud."  *Id.*

White argues that the district court failed to apply correctly two of our decisions:  *United States v. Medlock*, 792 F.3d 700 (6th Cir. 2015), and *United States v. Miller*, 734 F.3d 530 (6th Cir. 2013).  Although *Miller* and *Medlock* are instructive, we cannot conclude that they counsel in favor of reversal.

In *Miller*, defendant David Miller was convicted by a jury of two counts of making false statements to a bank and two counts of aggravated identify theft in violation of 18 U.S.C. § 1028A.  734 F.3d at 534.  Miller, like White, argued that the aggravated identity theft conviction was improper because he did not "use" a means of identification pursuant to § 1028A.  *Id.*  We agreed with Miller and reversed his aggravated identity theft convictions.  *Id.* at 542.  Miller had received a loan from a bank for the purchase of land after pledging that land as collateral.  *Id*. at 534.  As part of the closing process, Miller submitted to the bank a resolution stating that all persons with an investment stake in the land had attended a recent meeting to discuss the potential loan, and that at that meeting those individuals voted unanimously to allow

the property to be pledged as collateral for the loan. *Id.* at 535. Both statements were false. The resolution also contained the handwritten names of all individuals with an investment stake in the property, as written by Miller's partner. *Id.*

The defendant's argument in *Miller* was that "18 U.S.C. § 1028A does not criminalize this conduct because he only lied about what [two of the investors whose names were written on the resolution] did, but he did not 'use' their names or identities." *Id.* at 539. Miller further asserted that he did not "use" another person's name "because he did not steal or possess their identities, impersonate them or pass himself off as one of them, act on their behalf, or obtain anything of value in one of their names." *Id.* at 541. The government responded that "Miller 'used' their names to fraudulently obtain a loan from First Bank by misrepresenting that he had the authority to act on behalf of those individuals." *Id.* at 539.

In analyzing § 1028A, we concluded that the statute was ambiguous "[b]ecause the parties' competing interpretations of 'uses' demonstrate that it is not entirely clear whether § 1028A criminalizes Miller's conduct." *Id.* at 541. After concluding that legislative history provided no guidance for how we should resolve the ambiguity in Miller's case, and having been confronted with two reasonable interpretations of the term "uses," we applied the rule of lenity, which "requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *Id.* at 542 (quoting *United States v. Beals*, 698 F.3d 248, 273 (6th Cir. 2012)). In so doing, we concluded that "as a matter of law, Miller did not 'use' a means of identification within the meaning of § 1028A by signing a document in his own name which falsely stated that Foster and Lipson gave him authority [to act on their behalf] . . . ." *Miller*, 734 F.3d at 542. Specifically, we concluded that "[n]othing inherent in the term 'uses,' its placement in the text of § 1028A, or the statute's legislative history clearly and definitely indicates that the term, as applied to the names of persons, is broad enough to reach *the mere act of saying* that the persons did something" when they in fact had not. *Id.* (emphasis added).

We applied our holding in *Miller* to a somewhat different set of facts in *Medlock*. There, Mr. and Mrs. Medlock operated a non-emergency ambulance service ("MAS") that transported patients to kidney dialysis. *Medlock*, 792 F.3d 703. The couple's transport company was later reimbursed for those transports by Medicare. *Id.* Pursuant to United States Department of

Health and Human Services ("HHS") guidelines, a non-emergency ambulance transport company is reimbursed "only when such transport is medically necessary for bedridden patients." *Id.* In those circumstances, the ambulance company must have an Emergency Medical Technician ("EMT") accompany the passenger. *Id.* at 703–04. Additionally, "[t]he ambulance company documents each trip with a certification of medical necessity (CMN), signed by a doctor, and a 'run sheet,' which a Medicare contractor other than the ambulance company reviews to determine whether Medicare should reimburse the company for the trip." *Id.* at 704 (footnote omitted). An investigation into MAS concluded that the company's records lacked some CMNs, and surveillance revealed "four patients walking, riding in the front seat, being double-loaded in an ambulance (i.e., being driven two patients, rather than one, at a time), being driven by single-staffed ambulances, or being transported by wheelchair (rather than stretcher)." *Id.* Each of those transports had been billed as "single-passenger and 'stretcher required' (or equivalent)." *Id.* Investigators also found at the couple's home a number of forged CMNs and run tickets. *Id.*

The government in *Medlock* argued "that the Medlocks 'used' the name and Medicare Identification Numbers of Medicare beneficiaries when they 'caused a claim to be submitted to Medicare for reimbursement that contained' such names and numbers 'without lawful authority to do so because the claim falsely stated that' stretchers were required for transport." *Id.* at 705. Finding the *Miller* rationale "persuasive," we concluded that the term "use" "must have a more limited definition than the government suggests." *Medlock*, 792 F.3d at 706. In comparing *Medlock* to *Miller*, we noted that "the defendant in *Miller* lied about what his *partners* did and the Medlocks lied about what *they* did . . . ." *Id.* (emphasis in original). In finding that the Medlocks did not "use" the names of their patients in violation of § 1028A, we emphasized that the Medlocks "*did* transport the specific beneficiaries whose names they entered on the forms; they lied only about their own eligibility for reimbursement for the service." *Id.* (emphasis in original). While the Medlocks "misrepresented *how and why* the beneficiaries were transported, . . . they did not use those beneficiaries' identities to do so." *Id.* at 707 (emphasis in original). The addendum to our *Medlock* opinion is also instructive. *Id.* at 712. There, we affirmed Kathy Medlock's conviction for aggravated identity theft where she "forge[d] a physician's signature and thus us[ed] his identity to secure reimbursement fraudulently for unnecessary ambulance

transports." *Id.* We concluded that "[o]ur rationale for reversing the convictions [on the aggravated identity theft counts relating to the previously discussed falsely submitted Medicare claims] does not apply" to the conviction for signature forging. *Id.*

In responding to our decisions in *Miller* and *Medlock*, the Government argues here that "[v]iewed in a continuum, then, from (1) using names in a lie about what one did [*Medlock*], to (2) using names in a lie about what others did [*Miller*], to (3) using names to manufacture fake identification documents and then purporting to submit them on behalf of those persons [White], the facts in this case are well within the reach of the statute as it has now twice been construed." Gov. Br. at 30. The Government asks that we focus not "on what White did with clients' names at the time she obtained economic value through fraud," but "on what she did with their names afterwards when she was attempting to avoid having to repay that value." *Id.* at 31. Indeed, Count Two of the First Superseding Indictment alleges that White "used the noted means of identification to manufacture fake Armed Forces Identification Cards, which she then sent by means of interstate wire communications to Delta Airlines, Cain Travel, and The Travel Agent Company in an attempt to justify reduced fares that she had previously obtained" during the commission of her wire fraud scheme. R. 2 (First Superseding Indictment at 7) (Page ID #15).

We conclude that White's actions are distinguishable from both the *Miller* and *Medlock* defendants, and that White's actions in this case are most similar to Kathy Medlock's affirmed aggravated identity theft conviction for signature forging in the *Medlock* addendum. Both of those cases were principally about defendants who lied about their own actions. And, importantly, the personal information used in both *Miller* and *Medlock* was memorialized in documents that were submitted to other parties with the *Miller* and *Medlock* defendants' names and identities included on those documents. White did more than simply lie about whether her clients were eligible for military discounts. Indeed, she did more than assert to the airlines that her clients were eligible. She took a significant additional step, and submitted what she represented to be actual identification that the United States Military purportedly had issued for her clients. When White's scheme simply involved telling the airlines that her clients were members of the military, her statements to the airlines were similar to the resolution submitted to the bank in *Miller* and the inaccurate CMNs in *Medlock* because she was submitting false

information about others in her own name. The distinction in this case (and the similarity to Kathy Medlock's valid conviction under § 1028A for signature forging) arises from White's actions in creating false military identification cards and attempting to pass them off as her clients' own personal means of identification.

The parties do not dispute whether the manufactured military identification cards constituted means of identification or whether they were possessed without lawful authority. We note that "the phrase 'without lawful authority' in § 1028A is not limited to instances of theft, but includes cases where the defendant obtained the permission of the person whose information the defendant misused." *United States v. Lumbard*, 706 F.3d 716, 725 (6th Cir. 2013). Further, White's knowledge that she was submitting to the airlines the identification information of her clients satisfies the mens rea requirement of § 1028A. *Flores-Figueroa v. United States*, 556 U.S. 646, 657 (2009). We therefore conclude that White was properly convicted pursuant to 18 U.S.C. § 1028A because when she manufactured and submitted to the airlines the fraudulent military identification cards, she "used," without lawful authority, a means of identification of another person during and in relation to the wire-fraud felony of which she was convicted.

## C. Evidentiary Rulings on After-the-Fact Repayment Negotiations

White next argues that the district court abused its discretion by limiting her ability to admit documents related to after-the-fact repayment negotiations with victims of her fraud. As noted supra, we review evidentiary rulings for abuse of discretion. White, however, argues that the district court was not ruling on evidentiary issues, but rather was ruling that a particular defense was not available to White as a matter of law. Def. Br. at 25. White is incorrect. The district court excluded some of the evidence of post-loss repayment negotiations on the ground that the evidence was inadmissible pursuant to Federal Rules of Evidence 402 and 403. The district court did, however, permit certain evidence of White's attempts at repayment to proceed to the jury. We therefore conclude that the district judge's decision to limit evidence of after-the-fact repayment negotiations must be reviewed for abuse of discretion.

The Government points to *United States v. Carter*, 483 F. App'x 70 (6th Cir. 2012), a case upon which the district court relied, as the case most instructive on this point. Gov. Br. at

35; R. 146 (Trial Tr. Vol. 7) (Page ID #2007).  In *Carter*, a defendant sought to offer testimony from its corporate counsel that certain efforts were made to remedy and investigate apparent fraud after a demand for repayment had been made.  The district court in *Carter* excluded the evidence, and we affirmed, stating:

> A defendant's intention to repay the victims of fraud is no defense. Likewise, subsequent investigations, repayments, or settlement attempts shed no light on whether a defendant had a previous intent to defraud.  These efforts have at best . . . small probative value for the purpose of showing lack of evil intent.
> Defendant's subsequent attempts to rectify the fraud are irrelevant to his earlier intent or state of mind, and the district court was within its broad discretion under Rule 403 to exclude that evidence.

*Carter*, 483 F. App'x at 75 (citations omitted).  Three other circuits join the Sixth Circuit in curtailing admission of evidence of post-accusation repayment.  *See United States v. Jimenez,* 513 F.3d 62, 75 (3d Cir. 2008); *United States v. Suba*, 132 F.3d 662, 677 (11th Cir. 1998); *United States v. Sirang*, 70 F.3d 588, 595 (11th Cir. 1995); *United States v. Foshee*, 578 F.2d 629, 632 (5th Cir. 1978).

We note that the trial judge did admit evidence regarding repayments that White actually made.  The district court did not, however, permit the admission of evidence of loss-recoupment negotiations that transpired after White's plan was uncovered.  White sought to admit evidence that, long after her fraudulent scheme was discovered, she attempted to repay some of her victims for some of their losses.  These negotiations between White and her victims transpired only after White was confronted by the airlines, her victims, and law enforcement.  The temporal relationship between the fraudulent activity and the attempts at repayment is too attenuated to warrant a reversal.  The trial judge, having received full briefing on this issue, R. 94 (Def. Trial Br.) (Page ID #489); R. 98 (Gov. Resp.) (Page ID #500), decided that some of the evidence of repayment was inadmissible under both *Carter* and Federal Rule of Evidence 403, R. 146 (Trial Tr. Vol. 7) (Page ID #2007); R. 145 (Trial Tr. Vol. 6) (Page ID #1837), and we conclude that he did not abuse his discretion.

**D. Calculating Loss Attributable to Defendant White**

White's final argument is that the district court was speculative and incorrect in calculating the amount of loss the airlines suffered. The Probation Office calculated the loss to White's victims under U.S.S.G. § 2B1.1(b)(1)(H), which requires at least $400,000 but not more than $1,000,000 in intended loss. R. 112 (PSR) (Page ID #577). The method for calculating loss was adduced at trial from the testimony of various airline representatives. White argues that the airlines' testimony regarding their loss calculation, which the district court admitted at trial over White's repeated objections, was "subjective" and that it "significantly overestimated" the amount of loss to the airlines. Def. Br. at 30. The Government, noting that the district court correctly relied on the evidence presented at trial and distilled in the presentence investigation report in accepting the loss calculation, argues that "White challenges a body of documentary and testimonial evidence, provided by industry professionals with decades on the job, with nothing more than a line of ineffective cross-examination that she has recycled into a meritless appellate argument." Gov. Br. at 40.

"We review a district court's calculation of the 'amount of loss' for clear error, but consider the methodology behind it *de novo*." *Meda*, 812 F.3d at 519. "[T]he district court is to determine the amount of loss [under U.S.S.G. § 2B1.1(b)(1)] by a preponderance of the evidence, and the district court's findings are not to be overturned unless they are clearly erroneous." *United States v. Healy*, 553 F. App'x 560, 564 (6th Cir. 2014) (quoting *United States v. McCarty*, 628 F.3d 284, 290 (6th Cir. 2010)). In demonstrating clear error, "a defendant must show the calculation 'was not only inexact but outside the universe of acceptable computations.'" *Id.* (quoting *United States v. Martinez*, 588 F.3d 301, 326 (6th Cir. 2009)).

We cannot conclude from the record that the district court's determination of loss in this case was "outside the universe of acceptable computations," or that the methodology used to calculate loss was incorrect. *Id.* The trial record reveals that the airlines used standard ticket-auditing practices to determine the difference between the fares White obtained fraudulently and the next-cheapest fare possible. Several of the airline witnesses testified about the auditing process during trial, and several audit records were admitted into evidence.

Prior to sentencing, White filed several objections to the PSR, and the government responded. R. 115 (Def. Sent. Obj.) (Page ID #638); R. 116 (Gov. Resp.) (Page ID #654). In her sentencing memorandum, White stated her belief that "[t]he elements of the loss calculation are incorrect and overstated." R. 115 at Page ID #645. At sentencing, the government represented that "[a]s far as the guidelines go, meeting with [White's counsel], there is no dispute at this point as to the loss figures . . . . [White's counsel] has looked over my filing, Docket Number 116, and agrees with the government's calculations as far as loss goes." R. 150 (Sent. Hr'g Tr. at 4) (Page ID #2203); R. 116 (Gov. Sent. Mem. at 7) (Page ID #660). The government then specified the loss amount as $663,610. R. 150 (Sent. Hr'g Tr. at 5) (Page ID #2204). White's counsel then stated, "I agree on the loss number that we have come to, your Honor, in this sense: Of course we have raised objections about the admissibility of the government's evidence and, of course, preserve those objections. But we have no objections or want to present no different proofs on these points. . . . [W]e have come to an agreement on this loss number." *Id.* at Page ID #2205. The parties thus agreed that the total loss attributable to White for guidelines calculation purposes was $663,610. R. 150 (Sent. Hr'g Tr. at 5–6) (Page ID #2204–05); R. 116 (Gov. Sent. Mem.) (Page ID #660).

The record does not support a finding that the loss calculation offered by the government and accepted by the district court was outside the universe of acceptable computations. Indeed, the method used to calculate the loss was one that several airline industry witnesses agreed was reasonable, and White did not present evidence that an alternate theory was preferable. Moreover, White did not present evidence that her method would result in an amount below the beginning of the range in U.S.S.G. § 2B1.1(b)(1)(H) of $400,000. The district court's determination of the loss attributable to White was not clear error, and its method was reasonable. We therefore affirm the district court's conclusion regarding calculation of the loss.

### III.  CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgment of the district court.