**NOT RECOMMENDED FOR PUBLICATION**
File Name: 19a0486n.06

**No. 18-4144**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Sep 19, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| | ) | |
| CHARLES DAVID SNYDER, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE:    BOGGS, MOORE, and STRANCH, Circuit Judges.

**BOGGS, Circuit Judge.** Anyone who has received a paycheck knows that employers must deduct Social Security and Medicare taxes (or FICA taxes, for the Federal Insurance Contributions Act) from their employees' wages. 26 U.S.C. §§ 3101, 3102. "[T]he withheld money is held in trust for the United States until paid to the Treasury." *Bell v. United States*, 355 F.3d 387, 392 (6th Cir. 2004). "There is no general requirement that the withheld sums be segregated from the employer's general funds, however, or that they be deposited in a separate bank account until required to be paid to the Treasury." *Slodov v. United States*, 436 U.S. 238, 243 (1978). Consequently, "the funds accumulated" but not yet remitted "can be a tempting source of ready cash to a failing corporation beleaguered by creditors." *Ibid.*

David Snyder succumbed to this temptation when his consulting firm started to run out of money. At his direction, the company used FICA taxes that had been withheld from its employees' wages to pay business expenses, such as salaries and office rent. It did the same thing with

employees' 401(k) contributions. The company eventually failed, and a jury convicted Snyder of willfully failing to pay over taxes and embezzling from an employee-benefit plan.

On appeal, Snyder challenges several of the district court's evidentiary rulings and one of the jury instructions. We hold that the district court abused its discretion by admitting testimony about Snyder's failure to file personal income-tax returns. Accordingly, we vacate his tax convictions (Counts 2, 4, 5, 6, and 7) and remand for a new trial on those counts. Because Snyder's remaining arguments are unpersuasive, we affirm his embezzlement conviction (Count 8).

## I. Background

Snyder was the chairman, CEO, majority owner, and co-founder of Attevo, a technology-consulting firm. Founded in 2004, the firm was quick to expand, and its clients were slow to pay their bills. Then, in 2007 and 2008, came "the worst economic crisis we've had since the Great Depression." As Attevo's clients spent less on consulting and fell further behind on their bills, the firm started to run out of money, and its bank refused to lend any more. As his company's finances worsened, Snyder decided which bills to pay and which to ignore. He prioritized salaries, health-insurance premiums, and corporate credit cards (used for both employees' travel expenses and some of his own personal expenses).

The IRS was also "high on the priority list," according to one of Attevo's accountants, yet the firm's tax bills often went unpaid. In the fourth quarter of 2008, Attevo owed $462,774.81 in FICA taxes and remitted nothing. Around this time, Attevo's CFO, Joseph Burmester, warned Snyder that the IRS would charge the company penalties and interest if it failed to remit the taxes on time. But in 2009, Attevo paid only $62,072.19 of the more than $1.2 million in FICA taxes it then owed. In 2010, it paid its full FICA-tax obligations for the first and third quarters, but it paid nothing for the second quarter and nothing on its arrearages.

Throughout this period, Attevo was still withholding FICA taxes from employee paychecks. But instead of passing this money on to the Treasury, the company used it to pay other bills. As CFO Burmester put it, Attevo was "using the government as a short-term loan." It would be more accurate to say that Attevo was borrowing money from its employees, without their knowledge or consent.[1]

While this was going on, Attevo filed accurate FICA-tax returns, reporting the amount of money it had withheld from employees but not sent on to the Treasury. According to Burmester, "we knew the tax was due. We were trying to account for it properly. . . . We were not trying to hide the fact that . . . it just had not been paid. So it was, you know, a matter of coming up with the cash to do it."

Attevo did not come up with the cash, so the IRS's Collection Division got involved in September 2010. Attevo agreed to pay almost $2.9 million in outstanding FICA taxes for the fourth quarter of 2008 through the third quarter of 2010 in 69 monthly installments, to begin in October 2011. It paid ten of these installments, and for five straight quarters it also stayed current on the new tax obligations it continued to accrue.

Nevertheless, for reasons the record does not make clear, the IRS filed a lien against Attevo in March 2011. Employees "got really leery and . . . started leaving"; many took their clients with them, making the company's cash-flow problems even worse. By late 2012, Attevo's checks were bouncing, it had stopped making installment payments on back taxes, and fewer than ten employees remained. It went out of business in early 2013.

Meanwhile, similar problems arose with Attevo's 401(k) plan. The plan was funded entirely by employee contributions, which were deducted from paychecks. In late 2011, Attevo

---

[1] Until they are remitted to the Treasury, withheld FICA taxes are still the employee's money, even though the employer "briefly" holds them in trust for "administrative convenience." *Bell*, 355 F.3d at 392.

stopped remitting employee contributions to the retirement fund, though it continued to withhold them from paychecks. As with the FICA taxes, Attevo used its employees' money to pay business expenses, and all this was at Snyder's direction. The unremitted 401(k) contributions totaled about $126,000.

A grand jury eventually indicted Snyder on seven counts of willfully failing to pay over taxes, *see* 26 U.S.C. § 7202, and one count of embezzling from an employee-benefit plan, *see* 18 U.S.C. § 664. He went to trial. The facts were mostly undisputed; his defense was that his failure to remit the withheld FICA taxes and 401(k) contributions was not willful.

The jury acquitted Snyder of two of the tax counts (involving quarters for which Attevo made payments under its short-lived installment agreement with the IRS). It convicted him of the remaining five tax counts and the embezzlement count. The district court sentenced him to two years in prison and ordered him to pay more than $667,000 in restitution. He timely appealed.

## II. Testimony About Snyder's Failure to File Personal Income-Tax Returns

At trial, two IRS witnesses testified that Snyder had failed to file personal income-tax returns for many years. Snyder argues that this was propensity evidence, inadmissible under Federal Rules of Evidence 403 and 404(b). We agree. Snyder's alleged personal tax problems are not "substantially similar" to the charged conduct. *United States v. Jerkins*, 871 F.2d 598, 604 (6th Cir. 1989). We therefore hold that the district court abused its discretion[2] by admitting testimony about Snyder's personal tax history from one of the IRS witnesses, Special Agent Anthony Pizzola.

---

[2] "[A]buse of discretion is the proper standard of review of a district court's evidentiary rulings." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997).

Because the error was harmful, we vacate Snyder's tax convictions and remand for a new trial on those counts.[3]

A. Background

At Snyder's trial, the government called IRS Revenue Officer Evelyn Terry, who had been assigned to the initial investigation of Attevo and subsequent collection efforts. The government asked Terry if her investigation had revealed "any differences between Mr. Snyder and Mr. Burmester," Attevo's CFO. Terry responded, "Yeah. Mr. Snyder hadn't filed a 1040 tax return since 2004, and Mr. Burmester was in full compliance with all 1040 filing requirements." Snyder did not object.

Pizzola testified later. Pizzola, who worked for the IRS's Criminal Investigation Division, took over the Attevo case after Terry. The government asked Pizzola, "How about Mr. Snyder's personal situation, did you look at his income tax activity going back as far as you could?" The defense objected, and the district court overruled the objection. Pizzola answered: "Yeah . . . the last return on file personally for Mr. Snyder, and again, my investigation spanned from 2013 forward, the last return filed was 2011 for personal income taxes."

The government highlighted this testimony in closing, connecting Snyder's failure to file his personal income-tax returns with Attevo's failure to remit FICA taxes. The prosecutor argued: "[I]n addition to what the defendant did on behalf of Attevo, you heard testimony that the defendant wasn't even paying his own taxes. He'd done it before, and he was doing it this time."

---

[3] We need not review the admission of the second IRS witness's testimony, to which Snyder did not object, for plain error. Nor do we need to reach Snyder's argument (also unpreserved) that the government gave him inadequate notice of its plan to introduce this evidence.

B. Analysis

"The government may not use evidence of prior bad acts to show that a defendant's character made him more likely to commit the charged crime." *United States v. English*, 785 F.3d 1052, 1055 (6th Cir. 2015); *see* Fed. R. Evid. 404(b)(1). However, such evidence "may be admissible for another purpose, such as proving . . . intent . . . [or] absence of mistake." Fed. R. Evid. 404(b)(2). Even if the evidence is admissible under Rule 404(b), the district court may still exclude it "if its probative value is substantially outweighed by a danger of," among other things, "unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403.

Because the tax charges against Snyder are specific-intent offenses, this is the kind of case in which evidence of prior bad acts might be admissible. *See United States v. Johnson*, 27 F.3d 1186, 1191–92 (6th Cir. 1994). But that does not mean such evidence "is *automatically* admissible." *Id.* at 1192 (emphasis added).

Under Rule 404(b), prior bad acts are inadmissible if they "are too unrelated" to the charged conduct or "too far apart in time to be probative of" the defendant's specific intent. *United States v. Clay*, 667 F.3d 689, 696 (6th Cir. 2012). Likewise, dissimilar or long-ago bad acts are usually inadmissible under Rule 403, because they have "a powerful impact on a juror's mind" despite their "slim probative value." *Ibid.* There is "too much of a risk that the jury will generalize from prior examples of bad character." *Id.* at 697.

Applying these principles, this court has often held that evidence of uncharged tax crimes is admissible to prove willfulness in tax-evasion cases. But in these cases, the charged and uncharged conduct were quite similar.

| Case | Charged Conduct | Rule 404(b) Evidence |
|------|-----------------|----------------------|
| *United States v. Ausmus*, 774 F.2d 722, 723, 727–28 (6th Cir. 1985) | Failing to pay federal income taxes for 1978–80 | Failing to pay federal income taxes for 1967–77 and 1981–83 |
| *United States v. Popenas*, 780 F.2d 545, 546, 548 (6th Cir. 1985) | Failing "to report substantial amounts of income during the years 1977 to 1980" | Underreporting income in years before 1977 |
| *United States v. Jerkins*, 871 F.2d 598, 601, 604 (6th Cir. 1989) | Filing tax returns, but substantially underreporting income, in 1982 and 1984 | Failing to file income-tax returns in 1969, 1970, and 1971[4] |
| *United States v. Gordon*, 493 F. App'x 617, 619–20, 625 (6th Cir. 2012) | Underreporting income in 2003–05 | Underreporting income in years before 2003 |

When the charged conduct and the Rule 404(b) evidence are very similar, this suggests "a pattern, plan, and scheme[,] indicating that" the charged conduct "was not the result of an accident, negligence, or inadvertence. The pattern demonstrates willfulness," so the uncharged acts are admissible under Rule 404(b) (though they may still be inadmissible under Rule 403). *Ausmus*, 774 F.2d at 728.

In this case, by contrast, the charged conduct and the Rule 404(b) evidence are not "substantially similar." *Jerkins*, 871 F.2d at 604. Most importantly, while Pizzola testified about Snyder's failure to file personal income tax returns, Attevo undisputedly filed accurate FICA-tax returns for the quarters in which it did not remit employee contributions to the Treasury. The charged conduct and the Rule 404(b) evidence thus involved different taxes, taxpayers, and omissions.

---

[4] While the Rule 404(b) evidence in *Jerkins* was not especially similar to the charged conduct, "the only references" to that evidence came in passing, when the defendant's accountants "testified that they began working for him in preparing his delinquent returns" for the missing years. *Id.* at 605.

|  | Charged Conduct | Rule 404(b) Evidence |
|---|---|---|
| Tax | Employees' share of FICA taxes | Personal income tax |
| Taxpayer | Attevo (on behalf of its employees) | Snyder |
| Omission | Not remitting withheld funds | Not filing returns |

Finally, both the government and defense theories at trial centered on Attevo's dire financial straits. The defense argued that Snyder intended to remit the withheld taxes, but cash-flow problems got in the way; the government argued that Attevo had enough money coming in but chose, at Snyder's direction, to prioritize creditors other than the IRS. Yet there is no explanation, in Pizzola's testimony or anywhere else in the record, of why Snyder failed to file his personal income-tax returns or whether this had anything to do with Attevo's troubles.

In short, Snyder's tax problems and Attevo's were not part of a "pattern, plan, and scheme." *Ausmus*, 774 F.2d at 728. Pizzola's testimony served only to show that Snyder is the kind of person who cheats on his taxes. This propensity inference—"the defendant is a bad person . . . if he did it before he probably did it again"—is precisely the one Rule 404 forbids. *Johnson*, 27 F.3d at 1193 (cleaned up). For the same reason, the evidence about Snyder's personal income taxes was also inadmissible under Rule 403. It "was of slim probative value," and "the unfair prejudicial impact of the evidence was high." *Clay*, 667 F.3d at 696—97. Thus, the district court abused its discretion by admitting Pizzola's testimony about Snyder's personal income taxes.

This error only requires reversal if it was harmful. *Id*. at 700 (focusing on "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction") (internal citations and quotation marks omitted). For a non-constitutional error like this one, "the government must show *by a preponderance of the evidence* that the error did not materially affect the verdict." *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015).

If Pizzola's testimony had amounted only to an isolated blurt, the error likely would have been harmless (as Snyder conceded at oral argument). But Pizzola's comment was not the only reference to Snyder's personal tax troubles: Terry, the other IRS witness, also testified about them. And to make matters worse, the government's closing argument expressly invited the jury to make the propensity inference Rule 404(b) exists to prevent: "[Y]ou heard testimony that the defendant wasn't even paying his own taxes. He'd done it before, and he was doing it this time." The government's misuse of the testimony makes it impossible to dismiss the erroneous admission of this evidence as harmless.[5]

While the district court gave a limiting instruction, this is not "a sure-fire panacea for the prejudice resulting from the needless admission of" propensity evidence. *United States v. Haywood*, 280 F.3d 715, 724 (6th Cir. 2002). "As empirical studies have shown, evidence of prior bad acts influences factfinders even when the court gives a limiting instruction." *Clay*, 667 F.3d at 697. A limiting instruction may be "insufficient to mitigate these potential risks," and it does not preclude a new trial. *Id.* at 700–01. *See also United States v. Jenkins*, 345 F.3d 928, 939 (6th Cir. 2003).

However, the harm does not extend to Snyder's conviction for embezzling from an employee-benefit plan (Count 8). As we noted above, Rule 404(b) exists to prevent jurors from inferring that "if he did it before he probably did it again." *Johnson*, 27 F.3d at 1193 (cleaned up). The risk that jurors will make this forbidden logical leap is highest in the context of charged and uncharged offenses of the same nature (here, two tax crimes). The risk is lower when the charged and uncharged offenses are distinct, and Snyder gives us no particular reason to think the unfair prejudice also tainted his embezzlement conviction.

---

[5] Snyder also contends that the government's improper closing argument is itself sufficient for a new trial. We need not reach this issue.

Thus, we vacate Snyder's convictions for willfully failing to pay over taxes (Counts 2, 4, 5, 6, and 7) and remand for a new trial on those counts. We next turn to Snyder's arguments concerning the embezzlement conviction.

### III. Exclusion of Testimony About Snyder's Repayment of 401(k) Contributions

When some of Attevo's employees discovered that their 401(k) contributions had not been remitted to the retirement plan, they complained to the Department of Labor, which eventually filed a civil suit against Snyder and Attevo. To settle the suit, Snyder repaid more than $143,000 to the retirement plan. He made the final installment payment more than a year before he was indicted. At trial, Snyder tried to introduce evidence about his repayment of the 401(k) funds, but the district court refused to admit it. He contends that the district court erred, requiring a new trial on the embezzlement count. This argument is meritless.

First, the parties dispute the standard of review. Snyder argues that the standard is de novo, because the district court held "a particular defense unavailable as a matter of law." But "[a] defendant's intention to repay the victims of fraud is no defense." *United States v. Carter*, 483 F. App'x 70, 75 (6th Cir. 2012). By proffering the repayment evidence, Snyder was not trying to establish an affirmative defense. Rather, he was trying to negate the government's factual case on the mens rea element of the embezzlement offense. The district court deemed the repayment evidence irrelevant for this purpose. Thus, the usual abuse-of-discretion standard for evidentiary rulings applies. *United States v. White*, 846 F.3d 170, 178 (6th Cir. 2017).

The district court did not abuse its discretion by excluding the repayment evidence. Typically, repayments and settlement offers "shed no light on whether a defendant had a previous intent to defraud." *United States v. Carter*, 483 F. App'x 70, 75 (6th Cir. 2012). In most cases, "these efforts have at best small probative value for the purpose of showing lack of evil intent."

*Ibid.* (cleaned up). Thus, this court generally "curtail[s] admission of evidence of post-accusation repayment." *White*, 846 F.3d at 178.

This case is quite similar to *White*. The defendant in *White*, a travel agent, fraudulently booked plane tickets for her civilian clients at discounted military rates. *Id.* at 172. The district court excluded "evidence that, long after her fraudulent scheme was discovered, she attempted to repay some of her victims for some of their losses. These negotiations between White and her victims transpired only after White was confronted by the airlines, her victims, and law enforcement." *Id.* at 178. Because the "temporal relationship between the fraudulent activity and the attempts at repayment [was] too attenuated," excluding testimony about the repayment negotiations was not an abuse of discretion. *Ibid.*

Here, Snyder only repaid the 401(k) contributions after his employees discovered his embezzlement and the Department of Labor sued him. Thus, "the district court was within its broad discretion under Rule 403 to exclude [the repayment] evidence." *Carter*, 483 F. App'x at 75.

### IV.  The Cognovit Note and Related Jury Instruction

Next, Snyder argues that the district court abused its discretion by admitting evidence about a loan agreement he signed and by giving a consciousness-of-guilt jury instruction. Both claims fail. Admitting the loan-agreement evidence was not an abuse of discretion, and even if the evidence did not justify the jury instruction, the error was harmless.

### A.  Background

In 2012, as Attevo's problems worsened, Snyder asked his friend Gerald Hoch for money. Hoch obliged with a $300,000 check, made out to Attevo. Then, in March 2018—after his indictment but before trial—Snyder approached Hoch to borrow more money. Hoch agreed, on the condition that Snyder sign a written agreement to repay the 2012 funds. A few weeks later, Hoch

and Snyder executed a cognovit note[6] and loan agreement, which Hoch's attorney drafted. The agreement described the 2012 payment as a personal loan from Hoch to Snyder. This contradicts the testimony of Attevo's comptroller and Snyder's personal assistant, who both described Hoch's $300,000 payment in 2012 as an investment in Attevo, not a personal loan to Snyder.

The district court admitted evidence about both stages of these events—the $300,000 payment in 2012 and the loan agreement in 2018. Snyder has no objection to the evidence about the original payment, but he does challenge the district court's decision to admit evidence about the loan agreement.

To understand Snyder's objection, it is helpful to start with the reason the government introduced the loan-agreement evidence: to show potential fabrication of evidence or witness tampering by Snyder. The government leaves many steps in its argument unstated, but the theory seems to be this:

1. Nonpayment of taxes is only a crime if it is willful. 26 U.S.C. § 7202.
2. If someone owes the IRS money and can afford to pay, but chooses not to, that tends to show the nonpayment was willful. *United States v. Blanchard*, 618 F.3d 562, 572 (6th Cir. 2010).
3. If Hoch invested $300,000 in Attevo in 2012, then that money was available to Attevo to pay the IRS, suggesting that Snyder's conduct was willful.
4. But if Hoch instead made a $300,000 personal loan to Snyder, then the money was unavailable to Attevo to pay the IRS, suggesting that Snyder's conduct was not willful.
5. Attevo's comptroller and Snyder's personal assistant testified the payment was an investment in Attevo.
6. But the 2018 loan agreement describes the payment as a personal loan to Snyder.
7. Therefore, the loan agreement may have misrepresented the nature of the payment.
8. Snyder was responsible for the terms of the loan agreement, which he solicited.
9. The misrepresentation makes Snyder look less culpable.

---

[6] "The cognovit is the ancient legal device by which the debtor consents in advance to the holder's obtaining a judgment without notice or hearing . . . the purpose of the cognovit is to permit the note holder to obtain judgment without a trial of possible defenses which the [debtor] might assert." *D. H. Overmyer Co. Inc., of Ohio v. Frick Co.*, 405 U.S. 174, 177 (1972) (cleaned up).

10. Therefore, when Snyder executed the loan agreement (after he had already been indicted), he may have been attempting to fabricate evidence or affect Hoch's trial testimony.

11. Evidence of witness tampering or fabrication of evidence is admissible because it is probative of consciousness of guilt. *See, e.g.*, *United States v. Poulsen*, 655 F.3d 492, 508 (6th Cir. 2011).

The district court agreed with the government's theory. It reasoned that if Snyder used the post-indictment loan agreement to mischaracterize an investment in Attevo as a personal loan, this might show "an attempt to alter evidence," and "[i]f proven," it would be "probative of consciousness of guilt." The district court therefore admitted the loan agreement into evidence and allowed the government to elicit testimony about its terms, the circumstances of its execution, and whether the 2012 payment was really a personal loan.

Over Snyder's objection, the district court also gave a consciousness-of-guilt jury instruction. The instruction was based on this court's pattern instruction on flight, concealment of evidence, and false exculpatory statements. *See* Sixth Circuit Pattern Criminal Jury Instr. 7.14 (Jan. 1, 2019). It stated:

> You have heard testimony that after the crime was supposed to have been committed, defendant may have recharacterized a $300,000 investment as a loan.
>
> If you believe that defendant recharacterized a $300,000 investment as a loan, then you may consider this conduct, along with all the other evidence, in deciding whether the government has proved beyond a reasonable doubt that he committed the crime charged in Counts 1 through 7 of the indictment. This conduct may indicate that he thought he was guilty and was trying to avoid punishment. On the other hand, sometimes an innocent person may recharacterize an investment as a loan for some other reason. Defendant has no obligation to prove that he had an innocent reason for his conduct.

## B. Admissibility

Snyder argues that the district court erred by admitting the loan agreement and testimony about it from his personal assistant and Hoch. We hold that the district court did not abuse its

discretion, because this evidence was conditionally relevant under Federal Rule of Evidence 104(b).

Snyder makes four factual objections to the government's theory:

1.  At trial, the defense never argued that the $300,000 was unavailable to pay Attevo's tax bill, so it is implausible that Snyder was trying to make the loan agreement the basis for a false defense.

2.  Defense counsel did not know about the loan agreement until the government disclosed it on the day Hoch first testified (though obviously Snyder did), so again, it is implausible that Snyder was trying to concoct exculpatory evidence.

3.  Hoch testified that his attorney drafted the loan agreement; Snyder's only input was to add a term about interest payments.

4.  It is not true that if the $300,000 was a personal loan to Snyder, it would have been unavailable to pay Attevo's tax bills. The check was made out to Attevo and deposited into Attevo's bank account.

These arguments primarily go to the weight of the evidence, not its admissibility, and Snyder does not tie the arguments to a particular Federal Rule of Evidence. Instead, he cites a four-part test from *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir. 1977), which he claims this court has adopted for all consciousness-of-guilt evidence. This is incorrect. *Myers* involved evidence that the defendant had fled from FBI agents after the bank robbery he was charged with committing. *Id.* at 1048. The Fifth Circuit created a test for the "probative value" of post-offense flight from the police "as circumstantial evidence of guilt." *Id.* at 1049. We have adopted the *Myers* test, but only in "cases involving *actual flight*." *United States v. Hickman*, 766 F. App'x 240, 253 (6th Cir. 2019).

In cases involving evidence tampering, we simply apply relevant provisions of the Federal Rules of Evidence. Evidence tampering is potentially admissible as a prior bad act under Rule 404(b), as long as it is offered to show "consciousness of guilt" and not as character evidence. *Poulsen*, 655 F.3d at 508–09; *cf. United States v. Weaver*, 610 F. App'x 539, 542 (6th Cir. 2015) (using Rule 404(b) to analyze the admissibility of evidence that the defendant gave a false name

to arresting officers). With Rule 404(b) out of the way, the analysis shifts to Rule 403 balancing. *Poulsen*, 655 F.3d at 509. And the evidence must be relevant in the first place—i.e., it must be probative of tampering. *See* Fed. R. Evid. 401, 402.

Snyder's arguments line up best with the threshold question of relevance. "Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence," and that fact "is of consequence in determining the action." Fed. R. Evid. 401. This standard "is extremely liberal." *Douglass v. Eaton Corp.*, 956 F.2d 1339, 1344 (6th Cir. 1992) (abrogated on other grounds by *Weisgram v. Marley Co.*, 528 U.S. 440 (2000)). "Neither the appellate nor the district court is permitted to consider the weight or sufficiency of the evidence in determining relevancy . . . ." *Robinson v. Runyon*, 149 F.3d 507, 512 (6th Cir. 1998). "[A] piece of evidence does not need to carry a party's evidentiary burden in order to be relevant; it simply has to advance the ball." *Dortch v. Fowler*, 588 F.3d 396, 401 (6th Cir. 2009).

Though the parties do not explicitly frame it this way, this case raises the "abstruse" concept of conditional relevance. *Douglass*, 956 F.2d at 1348 (Ryan, J., concurring). The government offered the loan-agreement evidence to show Snyder's consciousness of guilt. But the terms of the agreement could be probative of Snyder's consciousness of guilt only if he contributed to its drafting. "When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist." Fed. R. Evid. 104(b). Thus, the admissibility of the loan-agreement evidence turns on whether the government made a sufficient showing of Snyder's role in drafting the agreement.

Like Rule 401's general-relevance test, the hurdle for this conditional-relevance determination is low. "In determining whether the Government has introduced sufficient evidence to meet Rule 104(b), the trial court neither weighs credibility nor makes" its own factual finding.

*Huddleston v. United States*, 485 U.S. 681, 690 (1988). Instead, the district court "examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact . . . by a preponderance of the evidence." *Ibid.*

Based on the facts before the district court at the time it admitted the loan-agreement evidence, the government met its burden. Two witnesses testified that Hoch's 2012 payment was an investment in Attevo, and one of them expressly denied that the money was a loan to Snyder. A reasonable juror could have credited the testimony of these witnesses and concluded that the 2018 agreement mischaracterized the 2012 payment. And because Snyder signed the agreement and had his personal assistant notarize it, a reasonable juror could have found that he had some influence over its language and terms.

Once the government made this initial showing, it became the jury's job to weigh the loan-agreement evidence. *Douglass*, 956 F.2d at 1348 (Ryan, J., concurring); *cf.* 21A C. Wright & K. Graham, *Federal Practice and Procedure* § 5054 (2d ed.) ("[T]he jury does not need the judge to tell them that defendant's hat does not identify him as the murderer if he is not the person who left it at the scene of the crime.").

While Hoch's subsequent testimony might have suggested that he and his attorney, not Snyder, were responsible for the language of the agreement, this did not retroactively make the admission of the evidence grounds for a new trial. Instead, the appropriate response may have been for the district court to "instruct the jury to disregard the evidence." *Huddleston*, 485 U.S. at 690. But Snyder never asked for such an instruction, and the district court did not have to give it sua sponte. *Id.* n.7.

Moreover, Hoch's testimony on this point was ambiguous. While he did testify that his attorney drafted the loan agreement and that Snyder's only suggestion was to add an interest term,

he also said that "the wording was pretty much in keeping with what Mr. Snyder and I were talking about." A reasonable juror could have interpreted this remark to mean that Hoch and Snyder negotiated the terms of the loan agreement orally, and what Hoch's attorney put into writing was the result of their negotiations.

That leaves Snyder's arguments about his defense theory, his counsel's unawareness of the loan agreement, and the availability of the $300,000 in Attevo's bank account. These are arguments about the weight of the evidence, not its relevance. According to Snyder's opening brief, they show that the government's fabrication theory "is entirely fanciful," that it contradicts what "one would expect to see . . . at trial," and that "[i]t would make little sense." This was an assessment for the jury to make.

Thus, applying Rule 104(b)'s conditional-relevance framework, the district court did not abuse its discretion in admitting evidence about the 2018 loan agreement.

### C. Jury Instruction

Snyder objects to the consciousness-of-guilt jury instruction for essentially the same reason. He argues that in light of Hoch's testimony that his attorney drafted the loan agreement, not Snyder, the instruction was unsupported by the evidence. Even if Snyder is right about this, the district court did not abuse its discretion. The instruction used permissive language, leaving the jury free to reach its own conclusion about the strength of the government's fabrication theory.

"We review challenges to jury instructions under the abuse-of-discretion standard. . . . A judgment may be reversed based upon an improper jury instruction only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *United States v. Williams*, 612 F.3d 500, 506 (6th Cir. 2010) (cleaned up).

Even if the evidence did not justify giving the consciousness-of-guilt instruction, it is difficult to see how the instruction could have confused or misled the jury or prejudiced Snyder. The instruction made two things very clear: It was up to the jury to decide whether Snyder fabricated evidence ("If you believe that defendant recharacterized a $300,000 investment as a loan, then you may consider this conduct"), and it was also up to the jury to accept or reject the consciousness-of-guilt inference ("This conduct may indicate that he thought he was guilty and was trying to avoid punishment. On the other hand, sometimes an innocent person may recharacterize an investment as a loan for some other reason.").

We generally assume that jurors are able "to discard factually inadequate theories of conviction." *United States v. Peterson*, 569 F. App'x 353, 356 (6th Cir. 2014). *See also United States v. Mari*, 47 F.3d 782, 785–87 (6th Cir. 1995). Snyder gives us no reason to think this case is exceptional. Thus, even if the district court abused its discretion by giving the consciousness-of-guilt instruction, the error was harmless.

## V. Cumulative Error

Finally, Snyder claims that even if the trial errors are "harmless in isolation[,]" their "combined effect . . . was so prejudicial as to strike at the fundamental fairness of the trial." *United States v. Parker*, 997 F.2d 219, 222 (6th Cir. 1993). But he does not identify any plausible connection between the harm resulting from the erroneously admitted tax evidence, the consciousness-of-guilt instruction, and the embezzlement conviction. His cumulative-error argument is therefore meritless.

## VI. Conclusion

For these reasons, we **VACATE** Snyder's convictions for willfully failing to pay over taxes (Counts 2, 4, 5, 6, and 7) and **REMAND** for a new trial on those counts. We **AFFIRM** Snyder's conviction and sentence for embezzling from an employee-benefit plan (Count 8).

**KAREN NELSON MOORE, Circuit Judge, dissenting.** Even if Snyder's failure to file individual income tax returns was not admissible for any legitimate purpose under Federal Rule of Evidence 404(b), Snyder's sentence should not be vacated because the error was harmless. Therefore, I dissent.

Rule 404(b)(1) of the Federal Rules of Evidence forbids the admission of "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Evidence of prior bad acts can be admitted, however, if they are offered "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b)(2). In addition, evidence of prior bad acts must pass the test of Rule 403: the probative value of evidence cannot be substantially outweighed by the danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Finally, even if an error was committed, a new trial is warranted only if the error was harmful and "it is more probable than not that the error materially affected the verdict." *United States v. Mack*, 729 F.3d 594, 603 (6th Cir. 2013) (quoting *United States v. Clay*, 667 F.3d 689, 700 (6th Cir. 2012)).

The issue here concerns two witness statements that alluded to Snyder's failure to file individual income tax returns. Evelyn Terry, an IRS agent who dealt with Attevo, was asked during re-direct whether she "consider[ed] the individual [Attevo] officers who [were] involved that [were] dealing with [her]." R. 153 (Trial Tr. Vol. 6 at 1255) (Page ID #2882). Eventually, the government pointed Ms. Terry to a document and asked her if there were any differences between Snyder and Attevo's CFO, Joseph Burmester; Ms. Terry said "Yeah. Mr. Snyder hadn't filed a 1040 tax return since 2004, and Mr. Burmester was in full compliance with all 1040 filing

requirements." *Id.* at 1256 (Page ID #2883). Snyder did not object to Terry's testimony. Then, six days later during re-direct, the government asked IRS criminal investigator Anthony Pizzola whether he had looked at Attevo's employment tax filings "as early as [he] could." R. 155 (Trial Tr. Vol. 8 at 1604) (Page ID #3231). Pizzola said that he had, and then the government asked him if he had "look[ed] at [Snyder's] income tax activity going back as far as you could?" *Id.* The defense objected to the government's question, but the district court overruled the objection. *Id.* Pizzola answered: "Yeah. In general, overall, I did. I think through the investigation, the last return on file personally for Mr. Snyder, and again, my investigation spanned from 2013 forward, the last return filed was 2011 for personal income taxes." *Id.*

During the course of instructions to the jury, the district court gave a limiting instruction about Snyder's failure to comply with other tax obligations:

> You have heard testimony that defendant may have failed to comply with other tax obligations. If you find defendant failed to comply with those tax obligations, you can consider the evidence only as it relates to the government's claim on defendant's intent, motive, preparation, plan, knowledge, and absence of mistake -- absence of mistake in relation to Counts 1 through 7. You must not consider it for any other purpose.

> Remember that defendant is only on trial here for the quarters alleged in Counts 1 through 7, not for the other acts. Do not return a guilty verdict unless the government proves the crime charged in the indictment beyond a reasonable doubt.

R. 156 (Trial Tr. Vol. 9 at 1942) (Page ID #3569). The government relies on this limiting instruction to argue that any error the district court may have committed by admitting evidence of Snyder's individual income tax failings was harmless. The problem with this argument is that the government said to the jury during its closing argument that Snyder "wasn't even paying his own taxes. He'd done it before, and he was doing it this time." *Id.* at 1982 (Page ID #3609). Less than one and a half hours after the district court had instructed the jury to use evidence of prior bad acts for permissible purposes only, the government openly invited the jury to use that evidence to make

a propensity inference. The government in effect argued to the jury that it should find Snyder guilty because of his past bad acts. That argument is exactly what Rule 404 forbids. I agree with the majority that the government made this a much more difficult case because of this closing argument. I disagree, however, with the majority's decision to end the harmless-error analysis here.

A new trial is not warranted "if the record evidence of guilt is overwhelming, eliminating any fair assurance that the conviction was substantially swayed by the error." *United States v. LaVictor*, 848 F.3d 428, 448 (6th Cir. 2017) (quoting *United States v. Hardy*, 643 F.3d 143, 153 (6th Cir 2011)). Here, the evidence of Snyder's guilt was overwhelming. His argument that he had every intention of paying the IRS but was unable—that the IRS was "high on the priority list"—was belied by the evidence. Despite its dire financial straits, Attevo managed to pay for its company country-club membership. R. 151 (Trial Tr. Vol. 4 at 447) (Page ID #2074). Attevo also regularly paid a creditor that had a connection to Snyder: a car dealership Attevo used for company rental cars, whose owner was related to Snyder. *Id.* at 446–47 (Page ID #2073–74). Finally, there was evidence that Snyder was funneling money from Attevo to himself and his company, Vista Capital, and to his wife. *See, e.g.*, R. 155 (Trial Tr. Vol. 8 at 1677–79) (Page ID #3304–06), R. 153 (Trial Tr. Vol. 6 at 1309–12) (Page ID #2936–39). Company credit-card records showed charges from Snyder for things such as family vacations, clothing, pool repairs, personal utilities, and groceries. *See, e.g.*, R. 155 (Trial Tr. Vol. 8 at 1664–65) (Page ID #3291–92), R. 153 (Trial Tr. Vol. 6 at 1306–07) (Page ID #2933–34). In sum, it was clear from the evidence at trial that Snyder was not a businessman trying his best in hard times. The money he withheld from the IRS was not being used to keep the company afloat; it was being used to enlarge

Snyder's personal fortune, and dollars not paid to the IRS were dollars free to go into Snyder's pocket.

Because of the overwhelming evidence of Snyder's guilt, admission of the two witness comments about Snyder's individual tax situation at most was harmless error, and therefore I would not vacate his tax convictions. Nor would I vacate his convictions because of the prosecutorial misconduct committed during closing arguments. The government's statement that Snyder had "done it before, and he was doing it this time" amounts to prosecutorial misconduct, even absent objection by the defense. R. 156 (Trial Tr. Vol. 9 at 1982) (Page ID #3609). The statement was a flagrant invitation to the jury to make a propensity inference; although isolated, it was deliberate; it had the power to mislead the jury, despite the district court's limiting instruction. *See United States v. Bradley*, 917 F.3d 493, 505 (6th Cir. 2019). Nevertheless, the evidence against Snyder was overwhelming, and so reversal for prosecutorial misconduct based on this single improper comment is not the appropriate remedy in this case.

In sum, any errors that may have happened were harmless, and a new trial is not warranted. Therefore, I dissent.